

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00050-CV

———————————————

CREEKSIDE RANCH GROUP, LLC, Appellant

V.

JAMES BERTRAM BLAIR AND ROBERT BLAIR, AS INDEPENDENT CO-EXECUTORS OF THE ESTATE OF MARY ADALINE LOVING BLAIR; LARRY HOLLINGSWORTH; CAROL BLAIR; KRAMER RESOURCES, LLC; THE ALLAR COMPANY; AND BRAZOS TITLE, LLC, Appellees

---

On Appeal from the 271st District Court
Jack County, Texas
Trial Court No. 20-11-111

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

The underlying dispute involves transactions for the sale of two tracts of rural property in Jack County that did not come to fruition as the buyer had hoped. The frustrated buyer is Appellant Creekside Ranch Group, LLC. Creekside sued a host of parties that it claimed were responsible for thwarting the sale. Certain of those parties are now Appellees: (1) James Bertram Blair and Robert Blair, who are independent co-executors of the Estate of Mary Adaline Loving Blair which was an owner of one of the tracts (hereinafter the Estate[1] or the Executors); (2) Larry Hollingsworth and Carol Blair, who were the real-estate brokers representing or involved with the owners of the tracts (collectively the Brokers);[2] (3) Brazos Title, LLC, which is an escrow agent that closed the sale of one of the tracts (hereinafter the Escrow Agent); and (4) Kramer Resources, LLC, which is a party that purchased one of the tracts, and the Allar Company, which is Kramer's grantee of that tract (hereinafter collectively the Subsequent Purchasers).

Appellees countered Creekside's suit with a barrage of motions for summary judgment attacking Creekside's liability theories; the trial court granted the motions in whole with a host of interlocutory orders. The trial court denied a motion for

---

[1] The parties often refer to this as the Blair Estate, and we use that term when quoting directly from their pleadings or briefs.

[2] We refer to Carol Blair as either Broker Blair or as Carol.

summary judgment filed by Creekside. The Executors and the Subsequent Purchasers also countered by filing declaratory-judgment actions with attorney-fee claims that relied on the fee provision of the Uniform Declaratory Judgments Act (UDJA). The trial court granted summary judgment on the declaratory-judgment claims and made associated fee awards. The Brokers and the Escrow Agent sought attorney's fees based on a contractual fee-shifting provision. The trial court granted these contractual fee claims and awarded fees and costs for those claims. A final judgment incorporated the trial court's interlocutory rulings. The trial court also signed findings of fact and conclusions of law with respect to certain of the fee awards that it had made.

Creekside now appeals and has filed a brief that purports to raise four issues but actually raises a challenge to most of the rulings made by the trial court in response to the Appellee's summary-judgment motions and fee requests. A high-level inventory of our holdings is as follows:

- We affirm, with one exception, the trial court's grant of summary judgment denying Creekside's liability theories. The summary-judgment record supports the trial court's ruling that the Estate did not breach a contract to sell the tract that it owned to Creekside because no contract was ever formed. For this reason and others that we will explain, Creekside's tort theories alleged against the Appellees also fail, and we affirm the trial court's summary-judgment rulings against Creekside on those theories. We reverse and remand an adverse summary judgment on a fraud claim that Creekside made against the Estate because the Estate did not move for summary judgment on that claim.

- The trial court erred by granting summary judgment on the Executors' and the Subsequent Purchasers' declaratory-judgment claims because those claims were attempts to repackage claims that were already before the trial court as a means to recover attorney's fees. We reverse the trial court's grant of summary judgment on the declaratory-judgment claims and the attorney's fee and cost awards that were predicated on the grant of declaratory relief and remand those claims to the trial court.

- The trial court erred by granting Broker Blair's fee requests because she did not fall within the terms of the contractual provision that she relied on to support her fee recovery. We render judgment against Broker Blair on this claim. We also hold that the trial court erred by granting the Escrow Agent a recovery on its motion for summary judgment seeking expert-witness fees because its motion did not raise that claim as a ground. We remand this claim to the trial court.

- With certain exceptions, the outlined holdings require that we remand the trial court's specific fee awards.

## II. Factual and Procedural Background[3]

Creekside buys and sells ranch land and became interested in the purchase of an approximately 1,300-acre tract in Jack County. Portions of the tract were in separate ownership. The Estate owned the lion's share of over 1,200 acres (the Estate Property). The Mary Loving Howe Living Trust (hereinafter the Trust),[4] with Mary Loving Howe and A. Bart Howe acting as trustees, owned approximately 150 acres (the Trust Property). The Executors and one of the trustees are cousins, and both

---

[3]Our initial factual summary will be succinct and will borrow liberally from the statement of facts in Creekside's brief. We defer more detailed descriptions of the facts to our specific discussions of the issues raised by Creekside.

[4]The parties often refer to this as the Howe Trust, and we use that term when quoting directly from their pleadings or briefs.

tracts were listed jointly and had the same listing real-estate agent—Broker Hollingsworth.

Apparently, because of the ownership structure, Creekside made separate offers for the Estate Property and the Trust Property by sending Broker Hollingsworth two Texas Real Estate Commission (TREC) Farm and Ranch contracts, which were executed by Creekside. Each contract was made contingent on the simultaneous closing of the other. The contracts assigned roles to the persons that Creekside joined in the suit as the Brokers and the Escrow Agent: Hollingsworth was shown as the listing broker; Carol—the wife of one Executor and the sister-in-law of the other—was listed as "broker" who would also receive a commission; and the Escrow Agent was, in essence, responsible for closing the contracts.

It is without dispute that representatives of the Estate and the Trust signed the contracts. Broker Hollingsworth acknowledged to Creekside's broker that he had received the signed contract for the Estate Property but claimed that issues between the Estate and Creekside remained outstanding. The Estate Contract[5] was never physically delivered to Creekside. The legal effect of the failure to deliver the Estate Contract to Creekside and whether the parties' communication showed the formation of a contract even in the absence of delivery became the core issue in the litigation

---

[5]Though we hold that no contract was formed between the Estate and Creekside, for ease of reference, we refer to the proposed contract as the Estate Contract. We refer to the contract with the Trust as the Trust Contract.

below. The Trust Contract was delivered to Creekside and placed for closing with the Escrow Agent.

After a month lingered without the Estate's delivering an executed contract to Creekside, Broker Hollingsworth communicated to Creekside that the Estate had received an offer from Subsequent Purchaser Kramer. Apparently, news of the Kramer offer triggered an attempt by the Trust to terminate its contract because the absence of an Estate Contract rendered the simultaneous closing provision in the Trust Contract impossible.[6]

In response to the news of another offer, Creekside began to take steps to respond to what it viewed as the effort to sell the Estate Property out from under its purported contract with the Estate. Creekside told the Escrow Agent that it wanted to be notified should the Escrow Agent be contacted about either the Estate Property or the Trust Property and that a contractual dispute existed with respect to the two tracts.

Creekside also sent communications to the Brokers—Hollingsworth and Blair—asserting that it was their duty under the regulations governing real-estate brokers to deliver the signed Estate Contract to Creekside. Neither broker provided Creekside with the contract in response to this demand.

---

[6]Though Creekside also sued the Trust below and although it is listed as an Appellee in Creekside's brief, that brief tells us that Creekside has settled with the Trust.

The Estate did indeed contract to sell the Estate Property to Subsequent Purchaser Kramer and eventually closed on that sale. Initially, Creekside sued the Estate and the Trust for breaches of their contracts and for specific performance. Creekside later amended its petition to join the Brokers, the Escrow Agent, and the Subsequent Purchasers.

We summarize the causes of action that Creekside eventually brought against each Appellee:

The Estate

- Breach of contract,

- Tortious interference with the Estate Contract and the Trust Contract,

- Conspiracy to tortiously interfere with the Estate Contract and the Trust Contract, and

- Fraud.

The Brokers

- Violations of the Texas Occupations Code involving real-estate brokers,

- Tortious interference with contract, and

- Conspiracy to tortiously interfere.

The Escrow Agent

- Tortious interference with contract,

- Conspiracy to tortiously interfere, and

- Negligence.

The Subsequent Purchasers

- Tortious interference with contract and

- Conspiracy to tortiously interfere.

As noted, Appellees attacked Creekside's liability theories by summary judgment, which the trial court granted in whole. Creekside's first issue on appeal combines its attack on the summary-judgment rulings invalidating its liability theories, with two exceptions. Creekside does not appeal the summary-judgment order denying it relief on its liability theories against the Subsequent Purchasers nor does it any longer rely on the Occupations Code as a separate theory of recovery against the Brokers.

Creekside's second issue challenges the trial court's granting of summary judgment on the Estate's and the Subsequent Purchasers' declaratory-judgment claims and the award of fees based on those claims. This issue turns on whether either party filed valid declaratory-judgment claims.

Creekside's third issue attacks Broker Blair's right to recover under the provision that she claimed supports her fee award. The third issue also makes a

narrow attack that the Escrow Agent's motion for summary judgment did not raise a ground seeking its expert-witness fees and that the same contract provision relied on by Broker Blair cannot support an award of expert-witness fees to the Escrow Agent.

Creekside's fourth and final issue attacks whether there was adequate proof of the fee awards to the various defendants.

We address each of these issues in turn.

### III. Analysis

#### A. Standard of review

We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). Certain of the motions for summary judgment that were filed were traditional motions; to be entitled to traditional summary judgment, the movant has the burden to prove that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). A defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Phan Son Van v. Peña*, 990 S.W.2d 751, 753 (Tex. 1999).

9

A defendant is also entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of that defense. *Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008); *see* Tex. R. Civ. P. 166a(b), (c). To accomplish this, the defendant must present summary-judgment evidence establishing each element of the affirmative defense as a matter of law. *Chau*, 254 S.W.3d at 455; *Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex. 1996).

Certain of the parties in this appeal filed hybrid motions for summary judgment, i.e., a traditional motion for summary judgment combined with a no-evidence motion. *See City of Magnolia 4A Econ. Dev. Corp. v. Smedley*, 533 S.W.3d 297, 299 (Tex. 2017). In a no-evidence motion, "a party without presenting summary[-]judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." Tex. R. Civ. P. 166a(i). To defeat a no-evidence motion for summary judgment, the nonmovant must produce at least a scintilla of evidence raising a genuine issue of material fact as to the challenged elements. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019). There is less than a scintilla of evidence when the evidence is so weak that it creates only a mere surmise or suspicion of a fact. *Id.*

The approach to the review of a hybrid motion presents subtleties, and how we review such a motion turns on the nature of the evidence presented:

> Usually, when a party moves for both traditional and no-evidence summary judgments, we first consider the no-evidence motion. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 219 (Tex. 2017). However, when both parties present evidence on a hybrid motion for summary judgment, . . . the differing burdens are immaterial and "the ultimate issue is whether the nonmovant raised a fact issue to preclude summary judgment." *Fossil Grp., Inc. v. Harris*, 691 S.W.3d 874, 882 (Tex. 2024); *see Buck v. Palmer*, 381 S.W.3d 525, 527 & n.2 (Tex. 2012) . . . . Accordingly, we do not segregate our review to address the different burdens associated with each type of motion for summary judgment, and in conducting our de novo review, we will review the full summary[-]judgment record to determine whether fact issues exist. *Tex. Dep't of Motor Vehicles v. Bustillos*, 630 S.W.3d 316, 331 (Tex. App.—El Paso 2021, no pet.); *Tawil v. Cook Children's Healthcare Sys.*, 582 S.W.3d 669, 686 (Tex. App.—Fort Worth 2019, no pet.).

*In re Cobb*, No. 13-24-00414-CV, 2024 WL 4940410, at *6 (Tex. App.—Corpus Christi–Edinburg Dec. 2, 2024, orig. proceeding).

Finally, Creekside and the Estate filed cross-motions for summary judgment on certain issues. When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary-judgment evidence and determine all questions presented. *Mann Frankfort*, 289 S.W.3d at 848. We should then render the judgment that the trial court should have rendered.[7] *See Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009); *Mann Frankfort*, 289 S.W.3d at 848.

---

[7]Creekside states that it is not appealing the trial court's denial of its summary-judgment motion.

11

**B. Issue One—Creekside challenges the trial court's adverse summary-judgment ruling on its liability claims.**

**1. Liability claims against the Estate**

**a. We affirm the trial court's summary-judgment ruling that no contract was formed between the Estate and Creekside.**

As part of its expansive first issue, Creekside challenges the trial court's grant of summary judgment against Creekside on whether there was an enforceable contract for the sale of the Estate Property to Creekside.[8] Though the Estate couched its argument in terms of the statute of frauds, Creekside characterizes the issue as one of contract formation and argues the issue through that lens.

The Estate contended that no contract was formed between it and Creekside because no contract was physically delivered by it to Creekside. Creekside counters that there is a fact question regarding whether a contract was formed—and thus whether a memorandum meeting the statute of frauds exists—because of four facts:

> (1) representatives of both Creekside and the Blair Estate signed the Blair Estate Property Contract as of September 7, 2020; (2) the Blair Estate delivered the fully executed document to its agent, Hollingsworth, two days later; (3) the Blair Estate Property Contract has an effective date of September 7, 2020; and (4) on September 9, 2020, Hollingsworth asked Creekside to consider a "contract amendment," any need for which would depend on a valid and existing contract.

Rather than establishing the presence of a fact question precluding summary judgment, Creekside's argument demonstrates the wisdom of a bright-line rule

---

[8]A contract for the sale of real estate requires a contract in writing. *See* Tex. Bus. & Com. Code Ann. § 26.01(b)(4).

requiring physical delivery of the contract as a precondition to contract formation. We will affirm the trial court's grant of the Estate's motion for summary judgment predicated on the assertion that no contract was formed.

### (1) We set forth the principles of contract formation that we apply.

It is a given that establishing the mutual assent necessary to establish contract formation generally requires the delivery of a contract with the intent to bind; even a signed contract is ineffectual to establish this requisite mutual assent unless it is delivered. The Texas Supreme Court had no problem holding that a breach-of-contract suit was properly dismissed based on special exceptions because a pleading failed to allege that a signed contract was ever delivered:

> Contracts require mutual assent to be enforceable. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind. *See Angelou v. Afr*[.] *Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citing *Hallmark v. Hand*, 885 S.W.2d 471, 476 (Tex. App.—El Paso 1994, writ denied), for the proposition that one of the elements generally required to create an enforceable contract is "[e]xecution and delivery of the contract with an intent that it become mutual and binding on both parties"). Here, although [appellee] alleges that [appellant] prepared and signed a draft of a contract to employ him for one year, he acknowledges that "[appellant] never delivered the contract to [him]." [Appellant] agrees. Taking [appellee's] pleadings as true, he has established that there was no delivery of a contract signed by [appellant], and thus no mutual agreement. Without mutual assent, there was no binding written contract. Because [appellee] could not have corrected this problem by repleading, the trial court did not abuse its discretion by sustaining [appellant's] special exceptions and dismissing this breach[-]of[-]contract claim.

*Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007).

13

The Corpus Christi–Edinburg Court of Appeals applied *Sonnichsen*'s requirement of delivery as a requisite to mutual assent to facts, though not on all fours, that are analogous to ours. *See Nanda v. Huinker*, No. 13-13-00615-CV, 2015 WL 5634367, at *3 n.4 (Tex. App.—Corpus Christi–Edinburg Sept. 24, 2015, no pet.) (mem. op.). In *Nanda*, a buyer executed a TREC form contract for the purchase of a condominium and delivered it to the seller. *Id.* at *1. The seller first indicated that he would return the paperwork quickly but then indicated that he did not "assent" to the terms of the contract and broke off negotiations. *Id.* at *3. Under this state of facts, *Nanda* concluded that summary judgment was properly granted on the buyer's breach-of-contract claim:

> We conclude as a matter of law that absent delivery of the TREC form to [appellant], there exists no written memorandum showing [appellee's] assent to the agreement. *See Sonnichsen*, 221 S.W.3d at 635 (holding there was no mutual agreement whe[n] employer prepared and signed draft of employment contract[] but never delivered it to employee); *Biko v. Siemens Corp.*, 246 S.W.3d 148, 161 (Tex. App.—Dallas 2007, pet. denied) (holding revised contract did not satisfy statute of frauds [because] it was never signed by the party to be charged or delivered to party seeking to enforce the contract); *Baccus v. Plains Cotton Co-op. Ass'n*, 515 S.W.2d 401, 402 (Tex. . . . App[.]—Amarillo 1974, no writ) (explaining that although a party admitted to signing an instrument, his "verified denial of delivery constituted a denial of the very existence of a contract performable by him, for until there has been a delivery, either actual or constructive, a contract is not effected"); *see also W. Tex. Hospitality, Inc. v. Enercon Int'l, Inc.*, No. 07-09-0213-CV, 2010 WL 3417845, at *5 (Tex. App.—Amarillo Aug. 31, 2010, no pet.) (mem. op.) (holding contract was unenforceable because of corporation's failure to sign and deliver original agreement as explicitly required in agreement).

*Id.*

Like almost every rule in the law, an exception exists to the rule that delivery is required to establish mutual assent. Creekside cites a number of cases in which a party's actions *manifest* an intent to the formation of a contract that makes the contract effective, no matter whether physical delivery occurred. *See Magnuson v. Citibank (S.D.) N.A.*, No. 2-06-465-CV, 2008 WL 426245, at *6 (Tex. App.—Fort Worth Feb. 14, 2008, pet. denied) (mem. op.) ("[W]hen the parties manifest an intent through their actions and words that the contract become effective, delivery is shown."); *accord Colvin v. Tex. Dow Emps. Credit Union*, No. 01-11-00342-CV, 2012 WL 5544950, at *7 (Tex. App.—Houston [1st Dist.] Nov. 15, 2012, no pet.) (mem. op.) ("[W]hen parties manifest an intent through their actions and words that a contract become effective, manual delivery is immaterial to contract validity."); *Ghia v. Am. Express Travel Related Servs.*, No. 14-06-00653-CV, 2007 WL 2990295, at *3 (Tex. App.—Houston [14th Dist.] Oct. 11, 2007, no pet.) (mem. op.) (same). But as the Estate notes, these cases deal with claims alleging an account stated based on the use of credit cards; there was no signed contract, but the party bound made an application, used the card, and paid the balances generated. For example, we held that "[d]elivery was established by [the cardholder's] use of the card and by his making payments on the account for the charges shown on his monthly billing statement." *Magnuson*, 2008 WL 426245, at *7. These account-stated cases are inapposite to the issue before us because the type of performance present under their facts is not present in this case.

And the holdings of the credit-card cases are not surprising. They are examples of the principle that delivery, as well as a signature, may not be needed to manifest assent to a contract. However, the standard to dispense with the need for these preconditions to contract formation is high. As the Texas Supreme Court has held,

> [W]hile signature and delivery are often evidence of the mutual assent required for a contract, they are not essential.
>
> > Texas law recognizes that a contract need not be signed to be "executed" unless the parties explicitly require signatures as a condition of mutual assent. If a written draft of an agreement is prepared, submitted to both parties, and each of them expresses his unconditional assent thereto, there is a written contract.

*Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 277 (Tex. 2015) (footnotes omitted) (quoting *Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 157 (Tex. 2010)).

The unconditional assent necessary to dispense with the formalities of signature and delivery requires a showing of other conduct that manifests mutual assent. Proof of mutual assent requires a meeting of the minds evidenced by objective manifest conduct—with that manifest conduct often being performance under the contract:

> Mutual assent is often referred to as the meeting of the minds. *E.g.*, *Izen v. Comm'n for Lawyer Disc[ipline]*, 322 S.W.3d 308, 318 (Tex. App.—Houston [1st Dist.] 2010, pet. denied[]); *Potcinske v. McDonald Prop. Invs.*, 245 S.W.3d 526, 530 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Whether mutual assent exists as to a contract's subject matter and essential terms is an objective inquiry, turning on what the parties said and did, not on their subjective states of mind. *Angelou . . .*, 33 S.W.3d [at] 278 . . . . Unexpressed subjective intent is irrelevant. *Id.* We look to

16

the communications between the parties and to their actions and the surrounding circumstances. *Id.*

A party can manifest its assent by conduct, provided it intends to engage in the conduct and knows or has reason to know that the other party may infer from its conduct[] that it assents. Restatement (Second) of Contracts § 19(2) (1981); *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 202 (Tex. 2021). So, for example, a party can manifest its assent to a contract by beginning the performance the contract requires of the party. *Mid-Continent Cas. Co.*, 323 S.W.3d at 157; *see also* Restatement (Second) of Contracts § 18 (1981) (manifestation of mutual assent requires each party [to] either make a promise or begin or render performance).

*Chubb Lloyds Ins. Co. of Tex. v. Buster & Cogdell Builders, LLC*, 668 S.W.3d 145, 151 (Tex. App.—Houston [1st Dist.] 2023, no pet.).

Thus, we conclude that delivery of a contract is the default rule to establish mutual assent but that delivery is dispensed with when there is "unconditional" evidence of mutual assent. In other words, delivery is a bright line to ensure that there are clear acts signaling mutual assent, but the bright-line conduct of delivery is unnecessary when a party manifests that assent by other acts that are unconditional, i.e., as unconditional as delivery.

> **(2)** **We set forth what the record establishes and Creekside's arguments regarding whether a contract was formed between Creekside and the Estate.**

As we noted in the introduction, Creekside itemizes four facts that it contends create a fact question on whether the Estate manifested an intent to form a contract even though no contract was delivered. Again, we are unpersuaded.

17

### (a) Delivery of the signed Estate Contract to the Estate's agent is not unconditional evidence of mutual assent.

The first two facts relied on by Creekside turn not on the delivery of the executed Estate Contract to Creekside but on the delivery of the contract to the Estate's own agent, i.e., one of the Brokers. That agent then informed Creekside that he had possession of the contract, and that contract has the date of its execution completed.

But the delivery of the contract went only so far as from the Executors (who signed it) to their agent. How this manifests mutual assent absent proof that the agent was instructed to deliver the contract is unexplained. Indeed, though the contract was delivered by the Executors to their agent, there is no evidence that the agent was authorized to deliver the contract to Creekside. As we will explain, the record shows the opposite.

A mere act of delivery is not sufficient; it is delivery with intent to bind. *Sonnichsen*, 221 S.W.3d at 635. The Executors delivered the contract to their agent, but it is the principal's decision and not that of the agent that binds. *See Coleman v. Otese Ltd.*, No. 02-19-00015-CV, 2020 WL 370577, at *6 (Tex. App.—Fort Worth Jan. 23, 2020, no pet.) (mem. op.) ("However, an agent cannot create the authority to bind the principal; actual or apparent authority is created only by the principal's words or conduct."). Indeed, "[a]n agent is bound to obey and follow the orders of his principal and is liable in damages for any injury consequent upon his departing from

18

them, however fair may have been his motives for such departure." *Albright v. Lay*, 474 S.W.2d 287, 291 (Tex. App.—Corpus Christi–Edinburg 1971, no writ.). Thus, passage of the signed Estate Contract into the hands of the Estate's Broker—unless the broker was instructed to pass the document to Creekside—is a nonevent in the effort to establish mutual assent.[9]

### (b) Completion of the effective date of the Estate Contract is not unconditional evidence of mutual assent.

The third fact relied on by Creekside—the Broker filled in the effective date of the contract—is a circumstance of so weak an effect that it is of no probative value.[10]

---

[9]Creekside argues that the facts here are different than those in *Nanda*:

> Here, Creekside presented evidence of words or actions attributable to the Blair Estate that the Blair Estate Property Contract had become effective. First, unlike *Nanda*, the Blair Estate signed the Blair Estate Property Contract and sent the fully executed document to its broker, who promptly informed Creekside that the signed document was in his possession. The broker . . . entered September 7, 2020[,] as the contract's effective date and "DATE OF FINAL ACCEPTANCE." [Record references omitted.]

We disagree and also note how *Sonnichsen* concluded that execution of a contract—without delivery—did not constitute contract formation. 221 S.W.3d at 635.

[10]We review circumstantial evidence to determine whether it is strong enough to create the inference that a party claims should be drawn from it:

> We must, however, review the totality of the known circumstances presented rather than just each piece of circumstantial evidence in isolation. [*Felker v. Petrolon, Inc.*, 929 S.W.2d 460, 463 (Tex. App.—Houston [1st Dist.] 1996, writ denied).] In that regard, an inference is not reasonable when it is premised on mere suspicion—"some suspicion

19

The completion of the effective date carries less sway than the fact that the contract was signed by the Executors. And like that act, whether filling in the effective date is unconditional evidence of mutual assent has to be viewed in the context of the remainder of the record, which—as we will explain—shows the absence of mutual assent.

> **(c)** **The communications between the Estate's Broker and Creekside undermine, rather than support, an inference of unconditional assent to formation of the Estate Contract.**

Creekside sidesteps an examination of whether the Estate's Broker was ever instructed to deliver the Estate Contract to Creekside with the intent to bind by arguing its fourth operative fact. That fact turns on the use of the term "contract amendment" in the Estate's Broker's communications with Creekside, and Creekside infers that "the broker immediately began negotiating a potential 'contract amendment' to the Blair Estate Property Contract to include other terms and a new

---

linked to other suspicion produces only more suspicion, which is not the same as some evidence." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 755 (Tex. 2003) (quoting *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993)). And when the totality of circumstantial evidence cumulatively "gives rise to any number of inferences, none more probable than another, [it] is legally insufficient to support an inference of a fact." *United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 642 (Tex. 2023) (internal quotations omitted). Stated differently, a bunch of nothing is still nothing.

*Reyes v. Mukerji Law Firm*, No. 01-22-00430-CV, 2024 WL 371102, at *8 (Tex. App.—Houston [1st Dist.] Feb. 1, 2024, no pet.) (mem. op.).

closing date, *thus confirming the principal document's validity*." [Emphasis added.] Creekside also argues that the Estate's Broker was obliged to provide the contract to it because the Occupations Code governing real-estate brokers requires them to "provide, on request, a copy of a document relating to a real[-]estate transaction to a person who signed the document." *See* Tex. Occ. Code Ann. § 1101.652(b)(28).

We will quickly dispose of Creekside's argument under the Occupations Code. We construe Creekside's argument to be that it can circumvent the requirement of delivery as a precondition to contract formation by demanding under the Occupations Code that another party's agent breach its duties and deliver a contract that it has not been authorized to deliver. Thus, Creekside argues that the Occupations Code permits an agent to form a contract that it was never authorized by its principal to form. In essence, Creekside argues that delivery to the agent constitutes an "implied" delivery of the contract to Creekside because of the Occupations Code provision.[11] Creekside cites no authority for such a novel and unreasonable theory.

If we understand it, the core of Creekside's argument is that mutual assent may be inferred from the delivery of the Estate Contract to the Estate's Broker augmented by his communications with Creekside. We do not know if Creekside is arguing that we should infer from these communications a manifest intent by the Executors to be bound by the contract or that the communications reveal in some way that the

---

[11]Creekside's brief contains a footnote stating that "Creekside does not rely on the Texas Occupations Code as [a] theory of recovery on appeal."

Estate's Broker was acting contrary to the instructions of his principal. No matter which inference Creekside seeks to draw, its own summary-judgment evidence does not support either inference but instead refutes them.

If we focus on the summary-judgment record—much of it being Creekside's summary-judgment evidence that was filed both in support of its own motion for summary judgment and in response to the Estate's motion—we conclude that the record establishes that mutual assent was never reached, and thus no contract was ever formed. As noted, Creekside hinges its argument on the use of the words "contract amendment" in an email. It cherry picks the words in an attempt to create an implication, but the implication is at odds with the total context of the Estate's Broker's communications. The context of those communications demonstrates that contractual terms remained unresolved between the Estate and Creekside and that delivery of the signed contract was never authorized.

Creekside's summary-judgment argument is built on the Executors' vague deposition testimony that they had signed the Estate Contract (a fact that is not disputed) and on other vague statements, such as that they had no "issues" with the contract, that they had "agreed" on the contract, that they did not "rescind" their signatures, that they had no "problems" with it, or that they did not know an "amendment" had been proposed. Thus, Creekside's theory is (1) that there was an implied delivery because the Executors viewed what they had signed to be the final expression of their deal with Creekside and (2) that their broker manifested this assent

by seeking to amend the contract or went rogue by inserting himself to add terms to the contract in violation of his duties to the Executors.

But within the very deposition excerpts that Creekside cites is evidence that the Executors never agreed on terms with Creekside; one of the Executors (Robert Blair) testified that there was not an agreement on terms, that the final decision-making process had been delegated to his sister-in-law (the other Broker, Carol Blair), and that she had informed the Executors that the deal had fallen apart:

> Q. Is it a true statement that the Blair [Estate] stated th[at] Creekside could not agree on terms?
>
> [THE EXECUTORS' ATTORNEY]: Objection. Form.
>
> THE WITNESS: That is my understanding.
>
> BY [CREEKSIDE'S ATTORNEY]:
>
> Q. And what is the document marked as Exhibit 4?
>
> A. . . . I don't understand that question.
>
> Q. Is this a contract signed by the Blair Estate and Creekside?
>
> A. It is a document signed by everybody.
>
> Q. Identified as a what?
>
> A. You mean -- can I read this?
>
> Q. Yes.
>
> A. Farming ranch contract. That's what it says.
>
> Q. Okay. And the parties for that contract are identified at the top of the page there. Who are they?
>
> A. The [E]state and Creekside.

23

Q. Got it. If you look at page 8, signed by all the necessary parties, isn't it you and your brother who had signed by Creekside?

[THE EXECUTORS' ATTORNEY]: Objection. Form.

[THE ESCROW AGENT'S ATTORNEY]: Objection. Form.

THE WITNESS: Yes.

BY [CREEKSIDE'S ATTORNEY]:

Q. Okay. So what terms did the Blair Estate and Creekside not agree on?

A. As I said before, we had -- we hired Carol as our agent, and she said something wasn't -- and I don't remember the details, but something was falling apart with the contract, and I don't know what it was.

[CREEKSIDE'S ATTORNEY]: Objection. Non[]responsive --

BY [CREEKSIDE'S ATTORNEY]:

Q. So you relied on Carol['s] saying that this document, Exhibit 4, had fallen apart?

A. In terms of what?

Q. Of not moving forward with closing on the contract of Exhibit 4.

A. Yes.

Q. Okay. Back to looking at Exhibit 14, when you look at Exhibit 4, what terms, that you know of, did the Blair Estate and Creekside not agree on?

A. I do not know.

Q. Okay. That would be a question for Carol, correct?

A. If you -- you can ask her. I mean, I -- for me, I don't know.[12]

Adding this evidence to the mix, Creekside's inference—that the delivery of the signed Estate Contract to the Estate's Broker is evidence of unconditional mutual assent when an Executor testified that an agreement had not been reached on the terms and that the deal had fallen apart—is unsupportable.

Even if we isolated our analysis to the communications from the Estate's Broker to Creekside and ignored the Executor's statement, Creekside's argument would still fail. Creekside emphasizes the words "contract amendment" as proof that the Estate's Broker acknowledged that a deal had been struck. The words "contract amendment" that Creekside builds its theory upon are but a minuscule part of a series of email communications that are included in Creekside's own summary-judgment motion and its response to the Executors' motion for summary judgment. Having reordered them to place them in chronological order, we include images of the emails:

---

[12]This testimony is included in the range of deposition testimony cited in footnote 20 of Creekside's motion for partial summary judgment and in footnote 22 of its response to the Estate's motion for summary judgment.

On Wed, Sep 9, 2020 at 10:26 AM <larry@lrpadmin.com> wrote:
Chad - I have received the signed contract from the Blair's. The Howe's will get their contract to me shortly. Let me try to address several things and hopefully we can get these cleared up and move forward. We are fine with terminating the hunting lease at the end of the deer season, Jan 3, 2021. I have attached a copy of the hunting lease and the grazing lease, along with the latest "Deer Population Summary". The Blair's have not had a grazing lease in several years. We will include the the following as a part of the contract:

"Seller shall furnish buyer a copy of hunting lease within 10 days of date of contract. If said lease does not provide for a harvest report to be given to Seller at least once per month. Seller shall use its best efforts to obtain harvest reports at least once per month from Lessee and use its best efforts to reasonably insure lessee does not abuse the property and lessee's rights."

We will set the closing date as Jan 12, 2021.

One more item the seller's would like to move forward with. In the NE corner of the ranch on FM 1191, John Cox of Game Management Services has had his hunting camp with trailer, etc for many years. It is less than one acre. My best guess using MapRight is it looks to be about .83 acres and is fenced off. The sellers would like to exclude that area from the sale. They will pay to have the survey updated to reflect that and no adjustment in price.

John included the following in an email to the Blair's. He is a good guy and more than willing to help. He's a certified wildlife biologist and is very knowledgeable in his field:

"Thanks Bert..also since these guys are interested in hunting and wildlife, If we can work out the camp site, I would be more than glad to share with them any information about the wildlife program and keep the property in the MLDP for them free of charge going forward. It will only help the whole area to continue the management plan and they would benefit a lot having a program on this place on any resale they may have planned. They are going to be our neighbors, so it would be a good jester to get off on the right footing with them."

Chad - Let me know what you think on the above. Probably the easiest way to do this is simply add a "Contract Amendment" with the new closing date and address the other issues under "Other" as an Addendum.........

Larry Hollingsworth
Broker/Owner
Longhorn Ranch Properties

--------------------

Subject: Re: Contract, etc...........
From: Chad Koonce <chadhcre@gmail.com>
Date: Wed, September 09, 2020 1:46 pm
To: larry@lrpadmin.com

Please forward me the signed contracts as soon as
you have received them.

Chad Koonce
Heritage Creek Real Estate, LLC.
(325) 234-1794

--------------------

Subject: RE: Contract, etc...........

From: <larry@lrpadmin.com>

Date: Wed, September 09, 2020 4:26 pm

To: "Chad Koonce" <chadhcre@gmail.com>

Chad - Haven't received the Howe's yet.  But, they will send it over shortly.
Sellers want to resolve the below issue before sending the contracts.  That way
we can add an amendment if that's what all decide.  Thanks............

Larry Hollingsworth
Broker/Owner
Longhorn Ranch Properties
940-521-9039

--------------------

On Wed, Sep 9, 2020 at 5:06 PM <larry@lrpadmin.com> wrote:
Chad - Sellers want to resolve the issue of the camp site acreage before going forward.
They just don't want an outstanding issue out there after all contracts are signed.  Let me
know what I can do to facilitate resolving this.  Thanks..........

Larry Hollingsworth
Broker/Owner
Longhorn Ranch Properties
940-521-9039

27

--------------------

From: **Chad Koonce** <chadhcre@gmail.com>
Date: Thu, Sep 10, 2020 at 7:34 AM
Subject: Re: Contract, etc...........
To: <larry@lrpadmin.com>

Working on getting new contracts Signed by Buyer with added language in the Special provision section. Along with a Closing Date of January 12, 2021.

I will forward them over once received.

We have highlighted various portions of the emails to show that there were outstanding issues between the parties. We agree with the characterization of the exchange in the Estate's brief that "[m]ore importantly, a review of the entire exchange defeats[,] rather than supports[,] Creekside's argument. What is being discussed in the email[s] at issue is merely how to paper the transaction via an addendum" and the potential of adding "an amendment if **in the future** the parties are able to come to terms on the remaining items."

When the Executors received another offer, their Broker sent another email to Creekside's broker showing that unresolved issues with Creekside still existed:

From: <larry@lrpadmin.com>
Date: Fri, Oct 9, 2020 at 9:58 AM
Subject: Blair Ranch
To: chadhcre@gmail.com <chadhcre@gmail.com>

Chad - We still do not have the survey. However, the Blair's received another offer on their ranch from an acquaintance in the metroplex. I was just notified of this late yesterday. If your buyer has an interest in revising his offer, please feel free to do so. Several things I would recommend.......remove Exhibit B and all items included in Exhibit B from any revised offer. Also, I would recommend removing the "Option Period" from any revised offer. If your buyer is interested in revising his offer, please have that to me no later than 5pm today. Please call with any questions. Thanks............

Larry Hollingsworth
Broker/Owner
Longhorn Ranch Properties
940-521-9039

In view of the overall import of these communications, the use of the words "contract amendment" does not deserve the driving force that Creekside's argument gives it.[13] Instead, the overall import of the emails is that negotiations were ongoing and that there were terms that required future agreement. As the Executors note, the supreme court has held that "futuristic" language does not satisfy the statute of frauds:

> Courts applying Texas law have confirmed that such writings couched in futuristic language contemplating later negotiations do not satisfy the statute of frauds. *E.g.*, *Hartford Fire Ins. Co. v. C. Springs 300, Ltd.*, 287

---

[13]Though a minor point because the entire context of the emails shows that there were outstanding issues, the Estate's Broker's email also noted the need for an "addendum." Case law notes that "addendum" carries a meaning that suggests a contract has not been reached. *See Stevenson v. Roberts*, No. 14-20-00075-CV, 2021 WL 2460577, at *3 n.2 (Tex. App.—Houston [14th Dist.] June 17, 2021, no pet.) (mem. op.) ("Black's Law Dictionary defines 'addendum' as '[s]omething to be added, usu[ally] to a document; esp[ecially], a supplement to a speech, book, contract, or other document to alter its contents or give more information.' Black's Law Dictionary (11th ed. 2019).").

29

S.W.3d 771, 778–79 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) [(op. on reh'g)] (holding that a writing containing "futuristic" language only contemplating "a contract or promise to be made in the future does not satisfy the requirement of the statute of frauds"); *Martco, Inc. v. Doran Chevrolet, Inc.*, 632 S.W.2d 927, 928 (Tex. App.—Dallas 1982, no writ) (observing that "authorities in other jurisdictions uniformly [ ] disqualify writings [that] contain 'futuristic' language as not confirmatory of a contract already in existence"); *CQ, Inc. v. TXU Min[ing] Co. . . .* , 565 F.3d 268, 276 (5th Cir. 2009) (holding that an agreement to "eventually" form an agreement is "contingent language [that] does not satisfy the statute of frauds"); *Micromedia v. Automated Broad. Controls*, 799 F.2d 230, 234 (5th Cir. 1986) (holding that "an offer for an agreement that was not entered into until later" did not satisfy the statute of frauds); *see also Cent. Ill[.] Light Co. v. Consolidation Coal Co.*, 349 F.3d 488, 489 (7th Cir. 2003) . . . ("The negotiations involved the exchange of many documents, but documents that merely evidence negotiations do not satisfy the statute of frauds.").

*Copano Energy, LLC v. Bujnoch*, 593 S.W.3d 721, 729 (Tex. 2020).

And the very communication that Creekside claims supports its "implied" delivery theory because the Estate's Broker had a duty under the Occupations Code to deliver the Estate Contract to Creekside undermines any inference of mutual assent. As we have noted, Creekside no longer asserts a cause of action against the Brokers for violating the Occupations Code, and we make no holding about the Occupations Code other than that Creekside makes unreasonable use of it. Instead, we look to what support it lends to Creekside's theory that a contract was formed when it demanded that the Estate's Broker deliver the contract and he refused to do so. That act refutes, rather than supports, an inference of mutual assent. Again, we provide images of the emails that Creekside included in its summary-judgment evidence:

-------- Original Message --------
Subject: Copy of signed contract
From: Chad Koonce <chadhcre@gmail.com>
Date: Tue, October 13, 2020 4:38 pm
To: larry@lrpadmin.com


Larry,

In an effort to be in compliance with TREC including you and Carol Blair, please send a copy of "the signed contract from the Blair's", you referenced and I requested on September 9, 2020.

Also, the Buyer's attorney has not been contacted yet. Please let me know the status of the attorney's getting together.

Mr. Dickens is certainly willing to be proactive in this matter and has personally requested for everyone to go the extra mile to attempt to work out the issues.

Please confirm receipt of this email.

Thank You

Chad Koonce
Heritage Creek Real Estate, LLC.
(325) 234-1794

--------------------

[FWD: Copy of signed contract]  2                Yahoo/Inbox

 **larry@lrpadmin.com**      Tue, Oct 13 at 5:50 PM
To: Carol Blair

Just received this. i have not and will not send that contract, unless you tell me to............

Larry Hollingsworth
Broker/Owner
Longhorn Ranch Properties
940-521-9039

31

------------------



larry@lrpadmin.com                    Tue, Oct 13 at 9:05 PM
To: Carol Blair

Sounds good. Will do..........

Larry Hollingsworth

These emails show that the Estate's Broker, after receiving Creekside's demand to deliver the Estate Contract, was seeking instruction about delivery of the contract from the very person that one of the Executors testified was the decision-maker with respect to the transaction. The emails show no evidence that delivery was authorized. Creekside's brief acknowledges that it finally had to obtain the signed contract in discovery.[14] And one of Creekside's discovery responses also notes that the contract was never delivered; the response states that "[t]he physical copy [of the contract] signed by [Appellees] is in [Appellees'] and Larry Hollingsworth's physical possession."

Finally, Creekside's summary-judgment motion attaches and quotes an email from the Estate's counsel confirming that the Estate's Broker was given instructions not to deliver the contract: "It is my understanding that prior to the email below[, Broker] Larry [Hollingsworth] was given verbal instructions not to deliver the executed contract until the ancillary issues were resolved and an amendment was agreed to by the parties[.]"

---

[14]Another document from Creekside notes that it had made three demands for the "signed contract [that Hollingsworth] referenced in his email of Sept[ember] 9, 2020."

### (3) Conclusion—No contract was formed between the Estate and Creekside because the Estate Contract was never delivered.

It is Creekside's theory that the summary-judgment record supports an inference that it was the Executors' intent that the deal was done when they signed the Estate Contract and delivered it to the Estate's Broker, and Creekside claims that his communications bear out that inference or that the Estate's "real[-]estate agents went rogue." But the record tells a different story. The Executors delegated the decision-making on the transaction to the spouse of one Executor as she was a real-estate broker. One of the Executors testified that there was no agreement on terms and that the decision-maker had informed him that the deal had fallen apart. Though the record does not contain the communications between the spouse and the broker who in turn communicated with Creekside's broker, the overall tenor of the communications shows that terms remained under negotiation. Indeed, the communications that Creekside includes in its summary-judgment evidence show that when Creekside demanded delivery of the contract, the Estate's Broker communicated with the Executors' decision-maker and was instructed not to deliver the contract.

Creekside's argument creates a chimera that there was an "implied" delivery because the Estate had assented to the Estate Contract and because the Estate's Broker was acting outside his instructions. But the record shows the contrary. Creekside's evidence hardly meets the standard that obviates the need for delivery

33

because there was "unconditional assent" to the contract's terms. Instead, the record here shows the wisdom of creating a bright line for contract formation that requires delivery of the contract itself and of not relying on an exception to that bright-line rule unless the evidence of mutual assent is unconditional.[15]

We overrule the portion of Creekside's first issue attacking the trial court's grant of summary judgment on its claim that a contract was formed for its purchase of the Estate Property.

> **b. We affirm the trial court's grant of the Estate's summary-judgment motion on Creekside's claim that the Estate tortiously interfered with the Estate Contract and the Trust Contract.**

Creekside's first amended petition alleged a claim for tortious interference with contract and for conspiracy to tortiously interfere against the Estate in one sentence: "The Estate interfered with the Trust Contract by wrongfully peddling the idea that the Estate Contract is not valid."[16] The Estate filed a supplement to its previously

---

[15]The Executors also moved for summary judgment on the ground that Creekside's original offer was revoked and replaced by a subsequent offer. The only evidence of the nature of the offer is a brief email from Creekside's broker referencing an "attached document," but that document is not provided in the record. Without even knowing what the document was, the Executors' motion for summary judgment did not establish its ground as a matter of law. *See* Tex. R. Civ. P. 166a(c).

[16]"To prove a claim for tortious interference with a contract, a plaintiff must establish (1) the existence of a valid contract subject to interference, (2) that the defendant willfully and intentionally interfered with the contract, (3) that the interference proximately caused the plaintiff's injury, and (4) that the plaintiff incurred actual damages or loss." *Cowden v. Henderson*, No. 02-23-00382-CV, 2024 WL 2854876, at *6 (Tex. App.—Fort Worth June 6, 2024, pet. denied) (mem. op.).

34

filed motion for summary judgment predicated on the principle that one cannot be held liable for interfering with its own contract. Creekside's response to the Estate's summary-judgment motion does not even mention its tortious-interference claim.

With barely a page and a half of text and no supporting authority, Creekside's brief argues that

> [t]he Blair Estate cited no evidence or authority supporting its contention that representations about a third-party contract's validity fall within its own contractual rights. Moreover, the Blair Estate here ignores its arguments that it has *no contract* with Creekside that could provide any such right. Yet the Blair Estate's position on tortious interference and conspiracy presupposes a contract affording it the right to make such representations.

In other words, Creekside contends that if a party argues that a contract to which it was a party was never formed—or if by asserting its own contractual rights, it allegedly interferes with another's contract—the rule that one cannot tortiously interfere with its own contract does not apply. Creating exceptions to the rule that one cannot interfere with one's own contract as advocated by Creekside would swallow both the effect and purpose of the rule. We reject Creekside's proposed exceptions to the rule.

### (1)    A party cannot interfere with its own contract.

The Texas Supreme Court has explained the basis for the rule that a party cannot interfere with its own contract as follows:

> Texas jurisprudence has long recognized that a party to a contract has a cause of action for tortious interference against any third person (a stranger to the contract) who wrongly induces another contracting party

to breach the contract. *See generally Raymond v. Yarrington*, . . . 73 S.W. 800, 802–04 (Tex. 1903) (reciting the history of this cause of action and recognizing its viability in Texas). By definition, the person who induces the breach cannot be a contracting party. Were we to recognize the tortious[-]interference claim when this identity of interest exists, any party who breaches a contract could be said to have induced his own breach and would therefore be liable for tortious interference. Such logic would convert every breach[-]of[-]contract claim into a tort claim. In most cases, however, this qualification is not an issue because the alleged tortfeasor is clearly a stranger to the contract.

*Holloway v. Skinner*, 898 S.W.2d 793, 794–95 (Tex. 1995).

To amplify,

We have held that the affirmative defense of justification can be based on the exercise of either[] (1) one's own legal rights; or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *Prudential*[ *Ins. Co. of Am. v. Fin. Review Servs., Inc.*], 29 S.W.3d [74,] 80 [(Tex. 2000)] (citing *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996) [(op. on reh'g)]). A defendant generally establishes justification as a matter of law "when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights." *Id.* at 81. If a trial court finds that a defendant has conclusively established the justification defense by proving a legal right to interfere with a contract, the defendant's motive or good faith underlying the interference is irrelevant. *Id.* at 80; *see also Tex*[.] *Beef*, 921 S.W.2d at 212 ("[W]e disavow good faith as relevant to the justification defense when the defendant establishes its legal right to act as it did.").

*Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 697 (Tex. 2017).[17]

---

[17]Creekside impliedly acknowledges that the Estate raised the affirmative defense of justification.

**(2)** **We explain why Creekside's tortious-interference claim contravenes the principle that a party cannot interfere with its own contract.**

Creekside sued the Estate for breach of contract, claiming a contract was formed, and alleged as follows: "The Estate *breached* the Estate Contract by (1) refusing to recognize the existence of a valid and binding agreement; and (2) purporting to sell the Estate Property to Kramer." [Emphasis added.] The Estate argued that no contract was formed that it could breach. Creekside never explains how a party's contention that the assertion of its rights under a contract does not constitute tortious interference differs from an assertion that the party is not liable for breach because no contract was formed. Both deal with a party's assertion of its own rights to claim that it was not liable for a breach of contract to which it was not a stranger. Adopting Creekside's distinction between these two positions would appear to transgress the rationale of the rule that a party's breach of its own contract should not be transformed into a tort, and Creekside has failed to explain why that is not the case. We reject Creekside's argument.

Creekside's second argument is a subtle attempt to alter the script. Its petition alleged that the Estate's assertion—that no contract was formed—interfered with the Trust's Contract on the smaller tract. Now its brief claims that "[t]he Blair Estate cited no evidence or authority supporting its contention that *representations about a third-party contract's validity fall within its own contractual rights*"—with no explanation or

allegation of what representation was made other than the Estate's claim that no contract was formed. [Emphasis added.] With no citation to the record or authority cited, this argument is waived. *See Floyd v. Floyd*, No. 02-23-00193-CV, 2024 WL 3714176, at *1 (Tex. App.—Fort Worth Aug. 8, 2024, no pet. h.) (mem. op.) (discussing principles of briefing waiver). But even if we reached the argument's merits, Creekside identifies no representation other than the Estate's non-tortious assertion of its own right that there was no breach because no contract was formed.[18]

Finally, in its reply brief, Creekside argues that "something other than the truth" nullifies the justification defense and cites the very page of *Community Health* that we quoted above. That quotation sets forth the principle that the justification defense is established as a matter of law when a defendant is merely exercising its own contractual rights, and once that showing is made, whether the defendant acted in good faith becomes irrelevant. *Cmty. Health Sys. Prof'l Servs.*, 525 S.W.3d at 697.

---

[18]Creekside's conspiracy claim was pleaded in one paragraph as follows:

> Upon information and belief, [Appellees] all knew of the other [Appellees'] actions (amounting to tortious interference) and acted in concert with one another to achieve their intended goal: avoid valid and legitimate contracts with [Creekside]. Thus, [Appellees] all conspired to tortiously interfere with the Estate Contract and [the] Trust Contract.

Creekside's brief makes no reference to any overt act on the part of the Estate other than the Estate's claim that the contract was not valid and argues that "[t]o the extent the trial court relied on [the claim that a party cannot interfere with its own contract] when rend[er]ing summary judgment on Creekside's tortious[-]interference and conspiracy claims against the Blair Estate, the court erred." Thus, our holding that the assertion of one's contractual right is not tortious interference disposes of the conspiracy claim as well.

When the curtain is pulled back on Creekside's tortious-interference claim against the Estate, the stage is set only for a breach-of-contract claim. We overrule the portion of Creekside's first issue attacking the trial court's grant of summary judgment on its tortious-interference and conspiracy claims against the Estate.

> ### c. The Estate's motion for summary judgment did not address Creekside's fraud claim, so it was error for the trial court to grant summary judgment on that claim.

Creekside's final attack on the trial court's summary-judgment rulings in favor of the Estate is that the trial court granted summary judgment on a fraud claim not challenged in the Estate's summary-judgment pleadings and thus granted the Estate more relief than it requested. We agree that this was error.

After the Estate filed its original motion and supplemental motion for summary judgment, Creekside amended its petition to allege a fraud claim predicated on the following alleged misrepresentation:

> [O]n or about November 16, 2020, [Appellees'] attorney Mr. Almanza sent an email that read, in relevant part, as follows: *"In the interim*[,] *if your client wants to extend a more competitive offer to purchase the property*[,] *I encourage him to do so."* Again, this is the same email in which Mr. Almanza unequivocally acknowledged *"the fact that my clients delivered an executed contract to Larry."* Mr. Almanza's email encouraging further negotiation via an additional offer was sent a mere four (4) days before the Estate to Kramer closing occurred. Again, and as per the deposition testimony of Mr. Hollingsworth, it was legally and factually impossible for [Creekside] to purchase the Estate Property at the point Mr. Almanza sent this email. That, presumably, is why Mr. Hollingsworth testified that Mr. Almanza's email was "misleading."

This fraud claim was not addressed in any of the Estate's summary-judgment motions.

It is axiomatic that a trial court may not grant a motion for summary judgment on a ground not raised by the moving party in its motion. Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer[,] or other response shall not be considered on appeal as grounds for reversal."); *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013). This principle often plays out as here when a plaintiff amends its pleading to allege a new claim after the defendant has filed its summary-judgment motion and the defendant does not amend its motion to address the new claim before the trial court grants a summary judgment adverse to the plaintiff on its entire case. *See Rust v. Tex. Farmers Ins. Co.*, 341 S.W.3d 541, 552 (Tex. App.—El Paso 2011, pet. denied) (stating that if an "amended pleading raises a new theory of liability, a summary judgment cannot be granted as to those new theories").

> But the failure to address the new claim may be a nonevent because it
>
> is not necessary for the defendant to file an amended or supplemental motion if its original summary[-]judgment motion was broad enough to encompass and address the plaintiff's newly raised claims or theories of liability[] and so long as the motion negates at least one element of the new and previously asserted claims.

*Konogeris v. Pinnacle Health Facilities GP I, LLC*, 657 S.W.3d 421, 426–27 (Tex. App.— El Paso 2022, no pet.). Other cases elaborate on this rule and explain that a new summary-judgment motion is not needed when

(1) the amended petition essentially reiterates previously pleaded theories of liability, (2) a ground asserted in a motion for summary judgment conclusively negates an element common to both the new claim and the previously pleaded claims, or (3) the original motion is broad enough to encompass the newly asserted claims.

*Bensal Ltd. P'ship v. Equity Secured Cap., L.P.*, No. 03-21-00099-CV, 2023 WL 2249207, at *4 (Tex. App.—Austin Feb. 28, 2023, no pet.) (mem. op.) (first citing *Callahan v. Vitesse Aviation Servs., LLC*, 397 S.W.3d 342, 350 (Tex. App.—Dallas 2013, no pet.); then citing *Coterill-Jenkins v. Tex. Med. Ass'n Health Care Liab. Claim Tr.*, 383 S.W.3d 581, 592 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); then citing *Rotating Servs. Indus., Inc. v. Harris*, 245 S.W.3d 476, 487 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); and then citing *Rush v. Johnson*, No. 03-19-00102-CV, 2019 WL 4020272, at *4 (Tex. App.—Austin Aug. 27, 2019, no pet.) (mem. op.)).

Here, there is no question that the Estate's motion did not raise a ground challenging the later-filed fraud claim. The Estate first tries to avoid this failing by arguing that Creekside waived error because it never objected to the failing and approved both the form of the trial court's interlocutory summary-judgment order that dismissed all of Creekside's claims against the Estate and the final judgment incorporating that ruling. The Estate cites no case that explicitly holds that a waiver exists under these circumstances. Further, the long-standing rule is that a motion for summary judgment stands or falls on its own grounds and that when no ground is raised, the nonmovant has no obligation to except to the motion. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342 (Tex. 1993) (stating that "[e]ven if the

41

non[]movant fails to except or respond, if the grounds for summary judgment are not expressly presented in the motion for summary judgment itself, the motion is legally insufficient as a matter of law" and concluding that "Rule 166a(c) does not require a non[]movant to except in this situation"). The Estate's argument presumes what is tantamount to a need to except to a legally insufficient motion for summary judgment when the need for that action has long been rejected. We disagree that Creekside waived its argument.

The Estate then argues that Creekside's fraud claim, though unaddressed in the Estate's motion, also failed: "Since [Creekside's] contract and interference claims were found to be without legal merit, Creekside could suffer no damage from being delayed in filing suit or in recording a *lis pendens* based upon those unmeritorious claims." In its reply brief, Creekside responds that "[f]raud is not derivative of breach of contract or tortious interference[] and [that] establishing an affirmative defense to breach of contract does not preclude a fraud claim as a matter of law." Creekside's fraud claim is predicated on a different cause of action and different events than the breach-of-contract and tortious-interference claims addressed in the Estate's motion. We do not know what evidence Creekside would muster to respond to a motion for summary judgment on the fraud claim or how it would predicate a damage claim. But there is not the necessary overlap between the grounds of the Estate's summary-judgment motions and the fraud claim for us to conclude that the trial court's summary judgment on the Estate's motions eliminated the fraud claim. Therefore, it

42

was error for the trial court to grant summary judgment on that claim, and we remand that claim to the trial court.

## 2. Liability claims against the Brokers

Brokers Hollingsworth and Blair filed a traditional and no-evidence motion for summary judgment on Creekside's tortious-interference claim against them. The traditional grounds of the motion argued that no claim for tortious interference could lie because no contract was ever formed. We agree but for the sake of completeness will also address the no-evidence grounds, which also support the propriety of the trial court's summary-judgment grant. Those grounds were stated as follows:

> Alternatively, Hollingsworth and Blair move for summary judgment on no[-]evidence grounds. As mentioned above, ample time has taken place for discovery (over 18 months)[,] and 9 depositions have been taken. Hollingsworth and Blair respectfully submit there is no evidence of (1) the existence of a valid contract subject to interference on the [Estate] Tract; (2) that either Hollingsworth or Blair willfully and intentionally interfered with any contract; or (3) that the conduct of Hollingsworth or Blair caused any damages to Creekside.

We will focus on the second element. Though we find that Creekside's argument is difficult to follow and that it takes liberties with the record, Creekside's argument appears to be that the Brokers engaged in an effort to submarine the Estate Contract without the authorization of their principals. Though we are unsure that this argument would create liability under any circumstances for the Brokers, here it is not borne out by the record.

### a. Generally, an agent cannot be sued for interfering with his or her principal's contract.

We have already held that there is no tortious-interference claim against the Estate because a claim that a party tortiously interfered with its own contract is not viable. "By extension, 'a contracting party's agent or employee acting in the party's interests cannot interfere with the party's contract.'" *Dockside Marine, L.L.C. v. Walker*, No. 09-23-00047-CV, 2024 WL 3220404, at *10 (Tex. App.—Beaumont June 27, 2024, no pet.) (mem. op.) (quoting *Brown v. CB&I, Inc.*, No. 09-12-00521-CV, 2014 WL 172413, at *8 (Tex. App.—Beaumont Jan. 16, 2014, no pet.) (mem. op.)). As we have noted, only a stranger to a contract may be liable for tortious interference with a contract, and that principle demonstrates why an agent of a contracting party is also not liable, barring circumstances showing that the agent was acting outside the principal's interest:

> This stranger-to-the-contract requirement means that "a contracting party's agent or employee acting in the party's interests cannot interfere with the party's contract." *Morgan Stanley & Co. v. Tex. Oil Co.*, 958 S.W.2d 178, 179 (Tex. 1997). Thus, to recover for tortious interference against an agent of a contracting party, "a plaintiff must prove that the agent willfully or intentionally acted to advance the agent's own interests at the principal's expense." *Prudential Ins. Co. of Am.*, 29 S.W.3d at 79. This is necessary "to preserve the logical rule that a party cannot tortiously interfere with its own contract." *Holloway*, 898 S.W.2d at 796. And for the plaintiff "to meet this burden in a case of this nature, the plaintiff must show that the agent acted in a fashion so contrary to the corporation's best interests that his actions could only have been motivated by personal interests." *Id.*; *accord* [*Cmty. Health Sys. Prof'l Servs.*], 525 S.W.3d at 691.

44

*Mission Toxicology, LLC v. Unitedhealthcare Ins. Co.*, 499 F. Supp. 3d 350, 366 (W.D. Tex. 2020).

> **b.** **There is no evidence that the Brokers' actions advanced their own interests over that of their principals, and for this reason, their actions cannot be the basis of a tortious-interference claim.**

Our starting point in analyzing Creekside's tortious-interference claim is a search for understanding regarding how the Estate's agents are liable for an act for which the Estate is not liable and what evidence there is that they were acting contrary to the Estate's interest. Creekside's brief does not attempt to answer this question. Instead, Creekside makes an argument that we simply quote:

> On the second element, Creekside presented legally sufficient evidence that Hollingsworth and Carol . . . interfered with the Blair Estate Property Contract and, by extension, the reciprocal Howe Trust Property Contract. Creekside presented evidence allowing a jury to find that, despite several requests under the Occupations Code, Hollingsworth refused to send the fully executed Howe Trust Property Contract in his possession to Creekside and told [Carol that] he would not do so without her instruction. Hollingsworth listed the properties together and knew about the simultaneous closing clauses. He also knew the Howe Trust Property Contract had been escrowed. While delaying delivery, Hollingsworth claimed to be negotiating an amendment for the Executors, but the [E]xecutors had no idea [that] an amendment was being proposed. When refusing to provide the cont[r]act as requested, Hollingsworth was not acting on the Executors' instructions.
>
> Carol . . . likewise did not send the executed document in response to an inquiry directed to her and denied that she had any connection to the transaction other than receiving a referral fee, yet Hollingsworth considered her to have authority over the transaction. Neither Hollingsworth nor Carol . . . informed the Executors about the purported termination of the Howe Trust Property Contract. Carol . . .

45

told Robert Blair that "something was falling apart with the [Blair Estate] contract." James Bertram Blair only signed the Kramer contract because Carol told him to, and Robert Blair only signed the Kramer contract because his brother passed along the instruction. This is more than a scintilla of evidence permitting a reasonable jury to find that the Brokers willfully and intentionally interfered with both contracts. [Record references omitted.]

We note initially that there are factual errors in the argument; it states that there was a refusal to provide the Trust Contract when the request was for the Estate Contract. Then we turn to how Creekside's brief characterizes the evidence that it cites. Creekside's brief states that the Executors had no idea that an amendment was being proposed and cites two snippets of testimony. The first snippet is from one of the Executors' depositions:

Q. Would you take a look at the document marked as Exhibit 6? If you flip to the second page, would you mind reading that highlighted portion aloud?

A. "Probably the easiest way to do this is simply add a contract amendment with the new closing date and address the other issues under Other as an addendum."

Q. Okay. Now, the document that has been marked as Exhibit 4, what issues did you have with that?

[THE BROKERS' ATTORNEY]: Objection, form.

THE WITNESS: I don't know that I had any.

The second snippet is from the other Executor's deposition:

Q. Do you recognize that document?

A. I do not recognize this.

Q. Okay. I'm going to ask you to take a look at the second page here. This is an email from one of your real estate agents, Larry Hollingsworth, dated September 9th, 2020, at 10:25 a.m.

It starts by saying, "Chad, I have received the signed contract from the [Executors]." He concludes that email by saying, "Chad, let me know what you think on the above. Probably the easiest way to do this is simply add a contract amendment with the new closing date and address the other issues under [O]ther as an addendum."

My question to you is were you aware that Mr. Hollingsworth had proposed an amendment to Exhibit 4?

[THE EXECUTORS' ATTORNEY]: Objection. Form.

THE WITNESS: No. No.

BY [CREEKSIDE'S ATTORNEY]:

Q. Okay. Would you have been agreeable to discussing a contract amendment?

A. Sure.

If the point of these references is to establish that the Brokers were on some type of selfish mission, it fails. The first reference is so vague that it is meaningless. The second indicates that the Executor did not object to the Broker's action.

And it appears that Creekside's argument is a shade and phase of the rogue-broker argument that it raised—and that we rejected—as the basis for its "implied delivery" argument.[19] Once again, Creekside ignores the evidence that its summary-

---

[19]Creekside concedes that if we affirm the trial court's summary judgment on the tortious-interference claim against the Brokers, its conspiracy-to-tortiously-interfere claim does not survive because that claim is derivative of the tortious-interference claim. Based on our disposition of Creekside's tortious-interference claim against the Brokers, we need not address Creekside's argument that the Brokers

47

judgment pleadings reference, i.e., the testimony that the Executors relied on Carol as an agent—who was the spouse of one Executor and the sister-in-law of the other—as the decision-maker in the transaction and that the Estate's Broker who communicated with Creekside was following her decisions and instructions. The other Broker, Hollingsworth, was shown to be an agent in the very real-estate contract upon which Creekside builds its case.[20] Without evidence that the Brokers stepped outside their proper role as agents, Creekside's tortious-interference claim is not supported by a scintilla of evidence that they committed an act of interference.[21] We overrule the portion of Creekside's first issue challenging the trial court's grant of no-evidence summary judgment on Creekside's tortious-interference claim against the Brokers.

---

did not move for summary judgment on Creekside's conspiracy claim. *See* Tex. R. App. P. 47.1.

[20]We do not presume an agency relationship exists, *see Cmty. Health Prof'l Servs.*, 525 S.W.3d at 697, but the fact of Carol's and Hollingsworth's agency is not in dispute.

[21]In its reply brief, Creekside does not challenge that the Brokers' agency insulates them from a tortious-interference claim. Instead, Creekside argues that the Brokers did not raise this issue in their no-evidence motion. We have noted that the Brokers' motion challenged the issue "that either Hollingsworth or [Carol] willfully and intentionally interfered with any contract." Creekside does not tell us why moving for summary judgment on this element would not be broad enough to encompass the agency argument.

### 3. Liability claims against the Escrow Agent

#### a. We affirm the trial court's grant of summary judgment on Creekside's claim that the Escrow Agent was negligent.

The Escrow Agent moved for summary judgment on Creekside's negligence claim on both no-evidence and traditional grounds. Both approaches relied on the absence of a duty owed to Creekside. Thus, we do not segregate our review to address the different burdens associated with each type of motion for summary judgment; we will review the full summary-judgment record to determine whether fact issues exist. *See Cobb*, 2024 WL 4940410, at *6.

We will chart the summary-judgment evidence shortly, but to give context, we quote the smidge of an argument contained in Creekside's brief regarding why it contends that it had a viable negligence claim against the Escrow Agent. Creekside argues that the Escrow Agent assumed the duty of an escrow agent in the Trust Contract and that

> Creekside's summary-judgment evidence would allow a jury to conclude that the Escrow Agent breached these duties, causing it damages. At all relevant times, the Howe Trust Property Contract and Creekside's earnest money sat in escrow with the Escrow Agent[]. That contract put the Escrow Agent on notice of a companion contract by which Creekside would purchase and simultaneously close on the Blair Estate Property. The Escrow Agent was immediately aware of this provision and specifically discussed it with the Brokers. Creekside notified the Escrow Agent when it began to have concerns about the Blair Estate transaction, but the Escrow Agent did not comply with Creekside's request that it be notified if anyone contacted the Escrow Agent about the Blair Estate or Howe Trust Properties. Instead, aware of the simultaneous closing requirement and the conflict between competing

49

contracts to buy the Howe Trust Property, the Escrow Agent only contacted the Brokers, ultimately accepting and closing on the Kramer contract to buy the Blair Estate Property. By closing on the Kramer contract, the Escrow Agent destroyed any ability to follow the agreed terms of the Howe Trust Property Contract and the Blair Estate Property Contract. [Record references omitted.]

In analyzing this argument, the first thing that we do not understand is the reference to "competing contracts" to buy the Trust Property as the record contains no additional contract on that property other than the one between the Trust and Creekside. But the argument's primary failure is the absence of an explanation regarding how the duty that Creekside advocates for was created. The Estate Contract was never placed in escrow; thus, no duty was ever created between Creekside and the Escrow Agent with respect to that contract. The Trust Contract was escrowed (and according to the summary-judgment evidence still remained so), and Creekside argues that because of the simultaneous-closing provision in that contract, a duty to protect Creekside regarding the Estate Property was created by "notice." This argument ignores that the prerequisite to the creation of escrow duties for that transaction—a contract by which the agent assumes those duties—never existed between the Escrow Agent, Creekside, and the Estate. Then Creekside never explains how the escrow duties that the Escrow Agent assumed in the Trust Contract created an obligation that it police the actions of the Estate to protect Creekside.

**(1)** **We set forth how the duties of an escrow agent are established and the limited scope of an escrow agent's duty in closing a real-estate transaction.**

The supreme court recently explained in detail how an escrow contract is created:

> This Court has only infrequently addressed the fundamental features of an escrow. In an adopted Commission of Appeals opinion early in the twentieth century, however, we set out the basic nature of an escrow as a "writing by the grantor, promisor[,] or obligor" deposited "with a third person not a party thereto" that was "to be kept until the performance of a condition or the happening of a certain event, *then to be delivered to take effect.*" *Green v. Priddy*, . . . 250 S.W. 656, 660 (Tex. [Comm'n Op.] 1923) (internal quotation omitted).
>
> We also glean insights from other cases from this Court that reference escrow. First, to create an escrow, the parties must *agree* to do so. *See City of Fort Worth v. Pippen*, 439 S.W.2d 660, 664 (Tex. 1969); *Pickle v. Whitaker*, 224 S.W.2d 741, 745 (Tex. . . . App.—El Paso 1949, writ ref'd); *Tyler Bldg. & Loan Ass'n v. Biard & Scales*, . . . 171 S.W. 1122, 1122–23, 1125 ([Tex.] 1914). This is because of the fundamental principle that an escrow holder owes fiduciary obligations to *both* parties, not just one. *See Pippen*, 439 S.W.2d at 664. Second, the escrowed property leaves the depositor's control through the duration of the escrow. *See Pickle*, 224 S.W.2d at 745.
>
> These principles yield the following basic common-law elements of an escrow:
>
> - a deposit of property (which could be a legal instrument such as a deed or contract)
>
> - upon an agreement by the parties
>
> - with a third party, who will owe fiduciary obligations to both parties for purposes of the property held in escrow
>
> - who will hold that property outside of the depositor's control and

51

- who will deliver that property to the other party upon the performance of a certain condition or the happening of a certain event, or otherwise will relinquish the property.

*Boozer v. Fischer*, 674 S.W.3d 314, 322–24 (Tex. 2023) (footnotes omitted).

Undoubtedly, an escrow agent may have certain fiduciary duties. *Zimmerman v. First Am. Title Ins. Co.*, 790 S.W.2d 690, 695 (Tex. App.—Tyler 1990, writ denied). But the nature of those duties is "limited and defined" by the duties assumed in the escrow contract. *Garcia v. Bank of Am. Corp.*, 375 S.W.3d 322, 333 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

In a real-estate transaction, an agent may act in two capacities: as a title insurer and as the escrow agent who closes the transaction. When acting only as an escrow agent, the extent of the agent's fiduciary duties is narrowed with the scope of the duties reaching only to the extent that they impact the closing of the transaction:

> A title insurance company assumes a fiduciary duty to both parties when it acts as an escrow agent in a transaction. *See Capcor at KirbyMain, L.L.C. v. Moody Nat'l Kirby Hous*[.] *S, L.L.C.*, [509 S.W.3d 379, 385] (Tex. App.—Houston [1st Dist.] . . . 2014, no pet.) . . . . These fiduciary duties consist of[ the following]: (1) the duty of loyalty; (2) the duty to make full disclosure; and (3) the duty to exercise a high degree of care to conserve the money and pay it only to those persons entitled to receive it. *Id.* (citing *Trevino v. Brookhill Cap*[.] *Res., Inc.*, 782 S.W.2d 279, 281 (Tex. App.—Houston [1st Dist.] 1989, writ denied)).
>
> When acting as an escrow agent, however, the title company's authority is limited to the closing of the transaction; it does not extend to an investigation of title. *Tamburine*[ *v. Ctr. Sav. Ass'n*], 583 S.W.2d [942,] 949[ (Tex. App.—Tyler 1979, writ ref'd n.r.e.)]; *see Holder-McDonald v. Chic*[.] *Title Ins. Co.*, 188 S.W.3d 244, 248 (Tex. App.—Dallas[] 2006, pet. denied) (observing that title insurance company's fiduciary duties are strictly limited to role as escrow agent)[. *S*]*ee generally Home Loan Corp. v.*

*Tex. Am. Title Co.*, 191 S.W.3d 728, 733 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (explaining that fiduciary's duties do not extend beyond scope of fiduciary relationship) (citing *Joe v. Two Thirty[ ]Nine Joint Venture*, 145 S.W.3d 150, 159–60 (Tex. 2004)).

*IQ Holdings, Inc. v. Stewart Title Guar. Co.*, 451 S.W.3d 861, 871 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Thus, we view the extent of the Escrow Agent's duty to be closing the Trust Contract.

**(2)** **Creekside's negligence claim against the Escrow Agent fails because the Escrow Agent never entered into an escrow relationship with respect to the Estate Contract and because the Trust Contract did not impose the duties on the Escrow Agent that Creekside claims it did.**

Here, the Estate Contract was never delivered between the parties, much less to the Escrow Agent. Indeed, the only copy of the contract in the record is unsigned in the spaces designated for signature by the Escrow Agent. Therefore, no tripartite escrow relationship was ever created between the Estate, Creekside, and the Escrow Agent, so the lynchpin of a duty on the part of the Escrow Agent to do anything regarding a transaction involving those parties is missing. The Escrow Agent had no duty to close that transaction. But even if we assume the broader duties imposed on a title insurer would have existed had the Escrow Agent contracted to serve in that role, no duty of loyalty, disclosure, or care to conserve the property and to pay funds to the entitled party encompasses the duty that Creekside attempts to impose. Accordingly, how the Escrow Agent assumed a contractual duty to report to Creekside about the status of a sale involving the Estate Property is unexplained.

53

Instead, it is apparently Creekside's argument that the Escrow Agent assumed an escrow agent role in the transaction between Creekside and another party—the Trust. Because of a provision in those parties' contract or because of concerns raised by Creekside, the Escrow Agent had notice that there might be a transaction between Creekside and the Estate; Creekside thus argues that this notice imposed duties on the Escrow Agent even though the agent never contractually agreed to assume those duties. We disagree.

Again, an escrow agent's duties are to close the transaction for which it acts as escrow agent. Nothing in the Trust Contract's escrow provision expands those duties to embrace the ones that Creekside claims exist; the contract only references the agent's responsibilities with respect to closing. Indeed, the provision specifies that the Escrow Agent cannot be held liable should one of the parties not perform and makes no mention of an obligation to police the conduct of the parties to a different contract. The escrow provision in the Trust Contract is as follows:

**18. ESCROW:**

A. ESCROW: The escrow agent is not (i) a party to this contract and does not have liability for the performance or nonperformance of any party to this contract, (ii) liable for interest on the earnest money and (iii) liable for the loss of any earnest money caused by the failure of any financial institution in which the earnest money has been deposited unless the financial institution is acting as escrow agent.

B. EXPENSES: At closing, the earnest money must be applied first to any cash down payment, then to Buyer's Expenses[,] and any excess refunded to Buyer. If no closing occurs, escrow agent may[] (i) require a written release of liability of the escrow agent from all

54

parties, (ii) require payment of unpaid expenses incurred on behalf of a party, and (iii) only deduct from the earnest money the amount of unpaid expenses incurred on behalf of the party receiving the earnest money.

C. DEMAND: Upon termination of this contract, either party or the escrow agent may send a release of earnest money to each party[,] and the parties shall execute counterparts of the release and deliver same to the escrow agent. If either party fails to execute the release, either party may make a written demand to the escrow agent for the earnest money. If only one party makes written demand for the earnest money, escrow agent shall promptly provide a copy of the demand to the other party. If escrow agent does not receive written objection to the demand from the other party within 15 days, escrow agent may disburse the earnest money to the party making demand reduced by the amount of unpaid expenses incurred on behalf of the party receiving the earnest money[,] and escrow agent may pay the same to the creditors. If escrow agent complies with the provisions of this paragraph, each party hereby releases escrow agent from all adverse claims related to the disbursal of the earnest money.

D. DAMAGES: Any party who wrongfully fails or refuses to sign a release acceptable to the escrow agent within 7 days of receipt of the request will be liable to the other party for (i) damages[,] (ii) the earnest money[,] (iii) reasonable attorney's fees[,] and (iv) all costs of suit.

E. NOTICES: Escrow agent's notices will be effective when sent in compliance with Paragraph 21[, which deals with notices]. Notice of objection to the demand will be deemed effective upon receipt by escrow agent.

And in its summary-judgment motion, the Escrow Agent went beyond reliance on the Trust Contract's terms and offered the affidavit of an expert, whose opinions reiterated why the duties of an escrow agent did not encompass the duty that Creekside claimed:

9. It is my opinion that [e]scrow agents owe no duty to mandate or coerce a party to perform their respective obligations under a contract to

55

which the escrow agent is performing escrow duties. Rather, it is my opinion that the duty of the escrow agent is (a) to act impartially and exercise ordinary care in guiding the parties with respect to the eventual closing of a contract; and (b) to perform normal fiduciary responsibilities with respect to monies placed with the escrow agent in the course of the performance by the parties under such contract.

10. It is my opinion that when Brazos received the Kramer/Estate Contract with regard to the Estate Property, Brazos had no duty to inquire or to undertake affirmative action to determine what may have transpired with the Plaintiff and the Estate with respect to the formation of the alleged Estate Property Contract[] or to inquire or determine whether a fully executed and enforceable Estate Property Contract actually existed. Rather, it is my opinion that the only fully executed contract presented to Brazos with respect to the Estate Property was the Kramer/Estate Contract, and Brazos had no duty or obligation to decline accepting the role of the escrow agent with respect to the Kramer/Estate Contract.[22]

We have searched the record to find the duty that Creekside tells us exists but does not chart other than to say that it falls within the ambit of the duties of an escrow agent. Such duty cannot be found in a role that never existed regarding the Estate Property, the Trust Contract does not create the duty that Creekside claims exists, and the Escrow Agent's expert negated the existence of a duty. The summary-judgment record negates a claim that the Escrow Agent had a duty to police the conduct of the Estate to ensure that Creekside's interests were protected. Nor does Creekside explain what duty the Escrow Agent violated with respect to the Trust Contract. It was not a violation of a duty to close the Estate Contract that rendered the simultaneous-closing provision of the Trust Contract an impossible one to meet;

---

[22]Creekside raised no challenge in the trial court or on appeal to the expert's testimony.

56

instead, that impossibility arose from the failure of Creekside and the Estate to form a contract. We overrule the portion of Creekside's first issue challenging the trial court's summary judgment on Creekside's negligence claim against the Escrow Agent.

> **b.** **We affirm the trial court's grant of summary judgment on Creekside's claim that the Escrow Agent tortiously interfered with the Estate Contract and the Trust Contract.**

Creekside argues that the trial court erred by granting the Escrow Agent's no-evidence and traditional motions for summary judgment on Creekside's tortious-interference claim. Our prior holding—that no contract was formed between the Estate and Creekside—establishes that the trial court did not err by granting summary judgment on Creekside's tortious-interference claim against the Escrow Agent.

Creekside contends that the Escrow Agent interfered with both its contract to purchase the Estate Property and its contract to purchase the Trust Property. With respect to the purported Estate Contract, Creekside does little more than incorporate its argument that a contract was formed. We have already held to the contrary. The most fundamental element of a tortious-interference claim is the existence of a contract that is subject to interference. Creekside acknowledges that its response to the Escrow Agent's no-evidence motion "replicated" the arguments that it had made in support of its argument against the Estate to show that a contract had been formed in accordance with the statute of frauds and that this argument "defeats the Escrow Agent's challenge to the first element of tortious interference." Simply, we dispense

57

with this contention by replicating our holding that no contract was formed. Because there was no evidence of an Estate Contract with which the Escrow Agent could have interfered, the trial court did not err by granting its no-evidence motion.

Of course, there is no dispute that a contract was formed between the Trust and Creekside. Creekside's brief tells us that it "eventually settled with the [Trust] in exchange for title to the [Trust] Property." Yet Creekside persists in arguing that the trial court erred by granting summary judgment on its claim that the Escrow Agent interfered with the Trust Contract.

As we have done before, we quote the entirety of the rationale in Creekside's brief for its argument, which—as with many of its other arguments—is bereft of authority:

> Creekside presented evidence that would allow a jury to find that the Escrow Agent interfered with both contracts by closing on the transaction between the Blair Estate and Kramer. At the time, the Howe Trust Property Contract requiring simultaneous closing on the Blair Estate Property Contract sat in escrow with the Escrow Agent awaiting closing. The Escrow Agent knew about the simultaneous closing provision and discussed it with the Brokers, both before and after it received the Kramer contract. Creekside had clearly and unequivocally informed the Escrow Agent about both of its contracts, but the Escrow Agent closed on the sale to Kramer. By doing so, the Escrow Agent picked the winner and loser in these deals, causing Creekside to lose the benefit of its bargain and to suffer damages. [Record references omitted.]

Thus, it is the premise of Creekside's argument that the Escrow Agent's closing of the sale from the Estate to Kramer interfered with the Trust Contract. We see a fundamental failing in Creekside's argument.

58

Two elements of a tortious-interference claim are that an act proximately caused a plaintiff's injury and that the act caused actual damage or loss. *Cowden*, 2024 WL 2854876, at *6. Creekside's theory of causation is that the Escrow Agent's act of closing the sale from the Estate to Kramer interfered by making it impossible to fulfill the contingency in the Trust Contract that made the closing of that sale "contingent upon a simultaneous closing with that one certain contract between" the Estate and Creekside. But Creekside's argument misplaces why the Trust Contract did not come to fruition. It was not the sale to another party that prevented the contingency from occurring. Instead, the reason that the contingency could not be met was more fundamental: there was no contract between Creekside and the Estate that came into existence and could be closed simultaneously or ever. Thus, the precondition to the precondition in the contingency provision of the Trust Contract never existed. Whether the Escrow Agent knew of the contingency or was informed of a contingency that could never be met because of circumstances outside the agent's control is irrelevant.

Nor did the Escrow Agent "pick[] the winner and loser in these deals." To the extent that there was a loss caused by the inability to have the simultaneous closing required by the Trust Contract, that failure was not caused by an action of the Escrow Agent. Again, the Escrow Agent had no hand in what caused the failure, which was the inability of Creekside and the Estate to form a contract that could be closed. The trial court did not err by granting the Escrow Agent's no-evidence motion for

59

summary judgment, which concluded that Creekside should take nothing on that claim. We overrule the portion of Creekside's first issue challenging the trial court's summary judgment on Creekside's tortious-interference claim against the Escrow Agent.

Overall, we overrule Creekside's first issue except for the portion challenging the summary judgment related to its fraud claim against the Estate; we sustained this challenge and therefore reverse that portion of the summary judgment and remand to the trial court Creekside's fraud claim against the Estate.

### C. Issue Two—Creekside challenges the trial court's summary-judgment rulings that the Estate and the Subsequent Purchasers were entitled to declaratory judgment.

Creekside challenges the trial court's grant of the Estate's and the Subsequent Purchasers' motion for summary judgment on their declaratory-judgment claims.[23] Creekside argues that neither of these parties raised appropriate grounds for declaratory relief but instead raised claims that were already before the court (and

---

[23]"A declaratory judgment granted on a traditional motion for summary judgment is reviewed de novo." *Angel v. Tauch*, 642 S.W.3d 481, 488 (Tex. 2022). Of course, our question is not about the propriety of a declaratory judgment but a question of the propriety of entertaining a suit for declaratory judgment and using that claim as a basis to recover attorney's fees. We review this question de novo as well. *See Morton v. Timarron Owners Ass'n*, No. 02-13-00409-CV, 2014 WL 2619189, at *3 (Tex. App.—Fort Worth June 12, 2014, no pet.) (mem. op.) ("We review whether [appellant's] declaratory[-]judgment claim and her claim for attorney's fees under [C]hapter 37 constitute an independent claim for affirmative relief or present issues beyond those raised by [appellee] under a de novo standard of review.").

indeed were already resolved by the trial court's interlocutory summary-judgment orders) as a subterfuge to obtain a recovery of attorney's fees. We agree.

### 1. A counterclaim under the UDJA in response to a breach-of-contract claim must be more than a denial of a plaintiff's claim and instead must involve greater ramifications than the underlying suit.

The UDJA has a fee provision, which defendants without another means to recover fees often try to invoke by filing a counterclaim under the Act. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."). However, this strategy fails when a counterclaim does not seek an appropriate declaration but merely seeks to clothe claims already before the trial court in the garb of a declaratory-judgment claim.

To protect against such deviousness in the arena of contract claims, courts impose the requirement that a declaratory-judgment counterclaim must involve a continuous relationship and greater ramifications rather than a repackaging of a breach-of-contract claim already before the court. As the First Court of Appeals recently explained,

> The [UDJA] is "not available to settle disputes already pending before a court." *BHP Petroleum Co. v. Millard*, 800 S.W.2d 838, 841 (Tex. 1990)[ (orig. proceeding)]; *Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 701 (Tex. App.—Houston [1st Dist.] 2007, no pet.). A party cannot assert a counterclaim for declaratory relief and attorney's fees based on mere denials of the opposing party's cause of action. *See Millard*, 800 S.W.2d at 841–42; *see also Winner v. Jarrah*, No. 01-19-00115-CV, 2020 WL 477222, at *7 (Tex. App.—Houston [1st Dist.] Jan. 30, 2020, no

61

pet.) ("[B]ecause the [UDJA] is not available to settle disputes already pending before the trial court, [] a mirror-image counterclaim for declaratory relief generally will not support an award of attorney fees[.]"[] (citations omitted)[]); *Mushtaha v. Kidd*, No. 01-09-00456-CV, 2010 WL 5395694, at *4 (Tex. App.—Houston [1st Dist.] Dec. 30, 2010, no pet.) (mem. op.) ("[A] counterclaim brought under the [UDJA] presenting no new controversies but brought solely to pave an avenue to attorney's fees is improper."[] (quoting *Warrantech Corp. v. Steadfast Ins. Co.*, 210 S.W.3d 760, 770 (Tex. App.—Fort Worth 2006, pet. denied))[])].

While this rule precludes a counterclaim that presents nothing more than a denial of the plaintiff's claim, the Texas Supreme Court has carved out an exception when the counterclaim seeks a true declaration of an ongoing and continuing relationship and when the counterclaim asserts relief having "greater ramifications" than the original suit. *Mustang Sec. & Investigations, Inc. v. Alpha & Omega Servs., Inc.*, No. 01-06-00093-CV, 2007 WL 4099413, at *3 (Tex. App.—Houston [1st Dist.] Nov. 15, 2007, no pet.) (mem op.). "A counterclaim has greater ramifications than the original suit if it seeks affirmative relief." *Id.* (quoting *Howell v. Mauzy*, 899 S.W.2d 690, 706 (Tex. App.—Austin 1994, writ denied)); *see Hous. Aeronautical Heritage Soc'y, Inc. v. Graves*, No. 01-12-00443-CV, 2013 WL 6506301, at *5 (Tex. App.—Houston [1st Dist.] Dec. 10, 2013, no pet.) (mem. op.) (noting that court may allow declaratory[-]judgment counterclaim if it states claim for affirmative relief). "'To qualify as a claim for affirmative relief, a defensive pleading must allege that the defendant has a cause of action, independent of the plaintiff's claim, on which he could recover benefits, compensation[,] or relief, even though the plaintiff may abandon his cause of action or fail to establish it.'" *Gen. Land Off. v. OXY U.S.A., Inc.*, 789 S.W.2d 569, 570 (Tex. 1990) (quoting *Weaver v. Jock*, 717 S.W.2d 654, 657 (Tex. App.—Waco 1986, writ ref'd n.r.e.)).

*Williams v. Hmaidan Holdings, LLC*, No. 01-23-00085-CV, 2024 WL 1862851, at *3–4

(Tex. App.—Houston [1st Dist.] Apr. 30, 2024, no pet.) (mem. op.).

As a specific illustration of the continuing-relationship principle, we set forth

the following example: "in the context of suits asserting breaches of contracts or

deeds, declaratory counterclaims seeking construction of such instruments may

constitute claims for affirmative relief because, in contrast to a 'one-time occurrence' giving rise to the plaintiff's suit, they concern the parties' ongoing and future relationship." *Mustang Sec. & Investigations*, 2007 WL 4099413, at *3. *Mustang* cited two examples of cases in which a declaratory judgment was appropriate to clarify an ongoing relationship. *See id.* (first citing *Millard*, 800 S.W.2d at 842 (reviewing a declaratory-judgment claim that sought an interpretation of a gas-purchase contract, which would have the effect of defining the obligations of the parties under that contract in the future); and then citing *Indian Beach Prop. Owners' Ass'n*, 222 S.W.3d at 702 (reviewing a declaratory-judgment action that sought interpretation of deed restrictions and "stated a cause of action on which they could recover benefits, compensation, or relief if [the plaintiff] abandoned or failed to establish its cause of action")).

**2. We set forth why the Estate's declaratory-judgment counterclaim fails.**

The Estate filed a declaratory-judgment counterclaim that sparsely alleged that "the [s]ale of the [Estate] Tract is valid and subsisting[] and [is] not subject to challenge or collateral attack in these proceedings."

We have already dealt with Creekside's and the Estate's cross-motions for summary judgment on the question of whether a contract was formed to sell the Estate Property to Creekside, and we affirmed the trial court's grant of the Estate's motion for summary judgment. After the interlocutory summary-judgment ruling, the

Estate filed a motion for summary judgment on its declaratory-judgment claim that amplified its pleaded basis for that claim:

16. In this case, the [Executors] successfully argued that there was no contract between them and Creekside, leading to summary judgment against Creekside's claims for breach of contract. Notably, the [Executors'] claim for declaratory relief is not related to any alleged breach by Creekside of the non-existent contract[] but instead seeks to affirm the validity (then and now) of the sale to Kramer. Accordingly, it is not duplicative of a breach[-]of[-]contract claim[] and is properly brought as a UDJA action.

17. By claiming that it had a preexisting contract that supplanted the sale to Kramer (and later suing Kramer itself), Creekside created a controversy over whether the [Executors'] sale to Kramer was valid. This in turn created uncertainty as to the [Executors'] liability to Kramer for the sale, and the rights and status of the parties regarding that transaction. In order to settle that controversy, the [Executors] properly sought declaratory relief that the Kramer transaction was valid and subsisting.

18. The [c]ourt's grant of summary judgment against [Creekside] shows that the [Executors] were justified in seeking declaratory relief[] because the Kramer transaction was valid and proper as a matter of law. The [c]ourt should formally grant the relief sought by the [Executors] to prevent confusion and avoid any further collateral attack of the Estate's sale to Kramer.

The trial court later signed a summary-judgment order decreeing that "the Estate Defendants' November 20, 2020 sale of property to [Subsequent Purchaser] Kramer . . . memorialized in the warranty deed filed as Instrument #202100507 in the Official Public Records of Jack County, is valid and subsisting."

In its brief, the Estate highlights Creekside's request that the trial court set aside the conveyance of the Estate Property to the Subsequent Purchasers and notes that

64

Creekside had filed a lis pendens. The Estate relies on these claims to justify its declaratory-judgment action because

> the status and legal availability of these vague title challenges created uncertainty as to the Blair Estate's liability to Kramer for the warranties [that] it [had] made concerning the sale, and the rights and status of the Blair Estate, Kramer[,] and even Creekside following the sale to Kramer. This uncertainty prompted the request for clarification by the Blair Estate via its UDJA counterclaim. The clarification sought was in no way "advisory" as Creekside contends[] because Creekside had already taken the affirmative step of filing a document in the public records stating that it was asserting affirmative claims to the [Estate] Tract[] and further had made allegations (though not legal claims) in this lawsuit implying that it had some right to invalidate the sale of the property to Kramer.

We conclude that the Estate did not allege claims of greater ramifications or facts showing a continuing relationship that support a declaratory-judgment claim. First, there is no continuing relationship. The only contractual relationship that existed between Creekside and the Estate was based on Creekside's claim that a contract between it and the Estate had been formed. That agreement did not implicate any continuing relationship such as the deed restrictions referenced in *Indian Beach* or the ongoing contractual gas-purchase obligation in *Millard*. *See Millard*, 800 S.W.2d at 842; *Indian Beach Prop. Owners' Ass'n*, 222 S.W.3d at 702. Instead, the Estate claimed that a contract is a one-time occurrence, which was resolved by the ruling that on the one occasion when Creekside claimed that it contracted with the Estate, no contract was formed.

65

Nor can we discern that there were greater ramifications to Creekside's claims that warranted declaratory relief. Again,

> [t]o qualify as a claim for affirmative relief, a defensive pleading must allege that the defendant has a cause of action, independent of the plaintiff's claim, on which he could recover benefits, compensation[,] or relief[] even though the plaintiff may abandon his cause of action or fail to establish it.

*Gen. Land Off.*, 789 S.W.2d at 570. The question unanswered by the Estate is what ramification would have existed had Creekside nonsuited its claims. If those claims evaporated, any claim that Creekside had to challenge the conveyance to a subsequent purchaser would similarly evaporate.

The Estate counters that Creekside's vague allegation prompted a need to have its sale to a subsequent purchaser declared valid in order to remove any uncertainty that its warranties to a subsequent purchaser were not breached. The Estate does not identify which warranties were of concern. If the concern is its warranty of title, that warranty is controlled by the following principles:

> A warranty of title does not warrant the title of the grantor but instead warrants the title of the grantee. *See Gibson v. Turner*, . . . 294 S.W.2d 781, 787 ([Tex.] 1956) [(op. on reh'g)] (addressing warranty in an oil-and-gas lease). Further, a warranty of title runs with the land and is not breached "unless and until there has been an actual or constructive eviction" of the grantee by an individual with superior title. *Id.*; *Rancho Bonito Land & Live-Stock Co. v. North*, . . . 45 S.W. 994, 996 ([Tex.] 1898); *Jones' Heirs[ v. Paul's Heirs]*, 59 Tex. [41,] 46[ (1883)]; *Shannon v. Childers*, 202 S.W. 1030, 1031 (Tex. App.—El Paso 1918, writ ref'd) ("The mere existence of a superior title in another, which has never been enforced, does not amount to a breach of the covenant of warranty.").

*Chic. Title Ins. Co. v. Cochran Invs., Inc.*, 602 S.W.3d 895, 902 (Tex. 2020). The claim to superior title in this case arose from the alleged contract between the Estate and Creekside. A judgment that no contract was ever formed abrogated Creekside's potential title claim.

On the bases offered by the Estate, we conclude that its declaratory-judgment claim was not based on a continuing relationship with Creekside and did not implicate relief of greater ramifications to the Estate than a judgment that Creekside take nothing on its contract claim against the Estate. The trial court erred by granting a summary judgment to the Estate on its declaratory-judgment claim and then relying on that claim as a basis to award attorney's fees to the Estate.[24]

### 3. We set forth why the Subsequent Purchasers' declaratory-judgment counterclaim fails.

The Subsequent Purchasers pleaded for a declaration that the deed Subsequent Purchaser Kramer received from the Estate was valid. The purpose of the tact taken by the Subsequent Purchasers appears calculated to draft around rules that would invalidate a declaratory-judgment claim. The Subsequent Purchasers are seeking to avoid the rule that a declaratory-judgment claim may not be used to resolve disputes that are already before the court or to quiet title. To avoid these rules, the Subsequent Purchasers seek to camouflage their claim under the guise of needing a declaration

---

[24]The Estate argues that Creekside's filing of a lis pendens supported its declaratory-judgment claim. But the Estate does not explain why it could not have moved to expunge the lis pendens. *See generally* Tex. Prop. Code Ann. § 12.0071.

67

about the validity of a deed. The Subsequent Purchasers' efforts fail. Another fundamental flaw in the attempt is that the declaratory-judgment claim that the Subsequent Purchasers raised is not one to which Creekside is a party.

After the trial court had granted the Subsequent Purchasers' summary-judgment challenge to Creekside's tortious-interference and conspiracy claims against them, the Subsequent Purchasers filed a motion for summary judgment on their declaratory-judgment counterclaims. The declaration was tied to the Estate's contract with Creekside and its impact on the Estate's deed that later conveyed the Estate Property to Subsequent Purchaser Kramer and in turn Kramer's conveyance of the property to Allar. The motion for summary judgment sets out the controversy and the declaration sought as follows:

> In its [t]hird [a]mended [o]riginal [p]etition, [Creekside] sought relief against Allar and Kramer in the form of tortious interference with a contract, conspiracy to tortiously interfere[,] and in the alternative[]
>
> > "an order setting aside the transfer of the Estate Property to Kramer/Allar and in connection therewith seeks the remedy of specific performance on the Estate Property . . . [Creekside] seeks to have those transactions set aside[."]
>
> This created a separate controversy regarding the validity of the conveyance of the Estate Property from Kramer to Allar. In response to this requested relief, Allar & Kramer sought a declaration from this [c]ourt that the alleged contract on the [E]state [P]roperty between [Creekside] and the Estate is not valid; that the contract for the sale of the [E]state [P]roperty from the Estate to Allar is valid; [that] the deed conveying the Estate Property from the Estate to Kramer is valid; and [that] the deed conveying the Estate Property from Kramer to Allar is valid and cannot be set aside by order of this [c]ourt. Accordingly, All[a]r and Kramer filed a counterclaim for declaratory relief to affirm

the validity of the Warranty Deed from the Estate to Kramer and from Kramer to Allar and to prevent collateral attack. [Pleading reference omitted.]

The motion later reiterates that "[t]his declaratory[-]judgment claim is to determine the validity of the conveyance from the Estate to Kramer and the subsequent conveyance from Kramer to Allar."

A later portion of the motion appears to offer an explanation for why the declaration sought by the Subsequent Purchasers was necessary: there is a question about the Executors' power to convey the property that might impact the contract between the Estate and one of the Subsequent Purchasers:

> Allar & Kramer successfully argued that the contract between the Estate and [Creekside] was void as a matter of law, leading to summary judgment against [Creekside] on [its] claim against Kramer and Allar for tortious interference with a contract. The [c]ourt's grant of summary judgment against [Creekside] shows that Kramer & Allar were justified in seeking declaratory relief because any alleged contract executed by the Estate for the [s]ale of the Estate Property is void as a matter of law because the [E]xecutor[]s lacked the power of sale. In light of the Executors['] lack of [the] power [to sell], all beneficiaries under the Last Will & Testament of Mary Adaline Loving Blair, Deceased, conveyed their respective interests in the Estate Property to Kramer. As a result, the [c]ourt should formally grant the relief sought by Kramer and Allar to prevent confusion, avoid any further collateral attack of the Estate's sale to Kramer[,] and affirm the validity of the deed from the Estate to Kramer and the deed from Kramer to Allar conveying the Estate [P]roperty.

The trial court granted this motion in an order that did not make any specific declarations.

The UDJA provides that

> [a] person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a . . . contract . . . may have determined any question of construction or validity arising under the instrument, . . . [or] contract . . . and obtain a declaration of rights, status, or other legal relations thereunder.

Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a). The Act's purpose is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." *Id.* § 37.002(b). "A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and [if] the controversy will be resolved by the declaration sought." *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995).

An example of a proper declaratory-judgment action that addresses the validity of a deed is found in a case cited by the Subsequent Purchasers. *See Wilhoite v. Sims*, 401 S.W.3d 752, 760 (Tex. App.—Dallas 2013, no pet.). *Wilhoite* decided whether a quitclaim deed was voidable for fraud. *Id. Wilhoite* held that "[a] suit for cancellation of a deed is an assertion of an equitable right, namely, the right to have a voidable deed cancelled" and was "not a claim of right to title and possession of real property." *Id.*

But as this court has held, a declaratory-judgment action is not a permissible vehicle to litigate suits to quiet title or suits for trespass to try title—causes of action for which attorney's fees are not recoverable:

70

A declaration under the UDJA is appropriate "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." Tex. Civ. Prac. & Rem. Code Ann. § 37.002(b) . . . . However, a party may not recover attorneys' fees under the UDJA when the only issues, aside from attorneys' fees, concern clearing of title or trespass to try title. *AMC Mortg. Servs., Inc. v. Watts*, 260 S.W.3d 582, 588 (Tex. App.—Dallas 2008, no pet.); *Sw. Guar. Tr*[.] *Co. v. Hardy Road 13.4 Joint Venture*, 981 S.W.2d 951, 956 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) [(op. on reh'g)]. "Any suit that involves a dispute over the title to land is, in effect, an action in trespass to try title, whatever its form." *Hawk v. E.K. Arledge, Inc.*, 107 S.W.3d 79, 84 (Tex. App.— Eastland 2003, pet. denied). Because a claim for declaratory relief is "merely incidental to the title issues," the UDJA will not supplant a suit to quiet title by allowing attorneys' fees under such circumstances. *Id.* (quoting *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268, 289 (Tex. 2002) [(op. on reh'g)]); *Sw. Guar. Tr*[.], 981 S.W.2d at 957.

*Poag v. Flories*, 317 S.W.3d 820, 828–29 (Tex. App.—Fort Worth 2010, pet. denied).

To analyze a violation of the rule that title actions should not be clothed as declaratory-judgment actions, we examine claims to ensure that they are not attempts to repackage title suits as declaratory-judgment claims. *Biltex Enters., Inc. v. Myers*, No. 02-13-00465-CV, 2015 WL 1967285, at *3–4 (Tex. App.—Fort Worth Apr. 30, 2015, no pet.) (mem. op.) (examining claims to determine whether they sought determination of a question of title); *XTO Energy Inc. v. Nikolai*, 357 S.W.3d 47, 62–63 (Tex. App.—Fort Worth 2011, pet. denied) (concluding that although the validity of the deed was contested, the essence of the suit was a title dispute and therefore an award of attorney's fees pursuant to the UDJA was improper); *Sani v. Powell*, 153 S.W.3d 736, 745 (Tex. App.—Dallas 2005, pets. denied) (stating that "[a]ny suit that involves a dispute over the title to land is, in effect, an action in trespass to try title,

71

whatever its form" and that attorney's fees awarded pursuant to the UDJA "are not available in a suit to quiet title or to remove cloud on title").

The parameters of a suit to quiet title are as follows:

A plaintiff seeking to quiet title must establish the following: (1) it has an interest in a specific property, (2) title to the property is affected by a claim by the defendant, and (3) the defendant's claim, though facially valid, is in fact invalid or unenforceable. *See Heredia v. Zimprich*, 559 S.W.3d 223, 233 (Tex. App.—El Paso 2018, no pet.); *see also Vernon v. Perrien*, 390 S.W.3d 47, 61 (Tex. App.—El Paso 2012, pet. denied). A quiet-title suit is an equitable action that exists "to enable the holder of the feeblest equity to remove from his way to legal title any unlawful hindrance having the appearance of better right." *Lance v. Robinson*, 543 S.W.3d 723, 739 (Tex. 2018)[ (]quoting *Bell v. Ott*, 606 S.W.2d 942, 952 (Tex. App.—Waco 1980, writ ref'd n.r.e.)[)].

To create a cloud on a title, the invalid claim[—]whether it be made by deed, contract, judgment, or other instrument[—]must appear facially valid; if it is void on its face, it has no power to affect the title or to otherwise prejudice the plaintiff, and it therefore does not create a cloud. *See Hahn v. Love*, 321 S.W.3d 517, 531 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) [(op. on reh'g)]. Thus, the claim must purport to convey an interest or make a charge upon the land of a true owner, the invalidity of which can only be revealed by resorting to additional proof or extrinsic evidence. *See* [*i*]*d.* at 531 (any claim not void on its face that "purports to convey an interest in or make any charge upon the land of a true owner, the invalidity of which would require proof, is a cloud upon the legal title of the owner[]"); *Best Inv. Co. v. Parkhill*, 429 S.W.2d 531, 534 (Tex. App.—Corpus Christi[–Edinburg] 1968, writ dism'd) (a cloud on title exists where "extrinsic proof" is needed to show its invalidity).

*Lyle v. Midway Solar, LLC*, 618 S.W.3d 857, 876 (Tex. App.—El Paso 2020, pet. denied).

We have already thoroughly outlined the principle that a declaratory-judgment claim cannot be used as a vehicle to recover attorney's fees by basing the action on controversies already before the court. *See Williams*, 2024 WL 1862851, at *3–4.

72

When we examine the Subsequent Purchasers' declaratory-judgment counterclaim, it violates the rules we have outlined for the proper use of a declaratory-judgment claim. The claims involving the Estate Contract were before the trial court and had been resolved. Stripped to their essence, the Subsequent Purchasers' claims include a quiet-title action in which the Subsequent Purchasers (1) viewed Creekside's contract claim as a cloud on the title that the Estate conveyed to Kramer and (2) sought relief that is tantamount to removing that cloud from their title. Indeed, the Subsequent Purchasers appear to have structured their declaratory-judgment claims with a wink to the rules that a declaratory-judgment claim should not be used to litigate claims already before the court or to litigate clouds on title.

The claim does not truly function as one directed at the validity of the deed to Kramer, nor is it one in which Creekside was involved. Again, once the trial court ruled that no contract existed between Creekside and the Estate, whether the deed to Kramer was subject to challenge is not an issue that implicates any further controversy with Creekside. Indeed, the pregnant question that arises from a declaratory-judgment action delving into the powers of the Executors to sell the property to Subsequent Purchaser Kramer is how that claim is lodged against Creekside at all. "A declaratory judgment requires a justiciable controversy as to the rights and status of parties actually before the court for adjudication, and the declaration sought must actually resolve the controversy." *Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 163–64 (Tex. 2004). The Act itself provides that "[w]hen declaratory relief is sought, all

persons who have or claim any interest that would be affected by the declaration must be made parties." Tex. Civ. Prac. & Rem. Code Ann. § 37.006(a). Creekside was not a party to any contract or deed between the Executors and the Subsequent Purchasers. Barring an enforceable contract, Creekside had no interest in that transaction. And likewise barring an enforceable contract, how the resolution of the controversy about the Executors' power to convey raised a question that would impact Creekside is unexplained. The trial court erred by granting summary judgment to the Subsequent Purchasers on their declaratory-judgment claim and then relying on that claim as a basis to award attorney's fees.

We sustain Creekside's second issue challenging the trial court's grant of summary judgment on the Estate's and the Subsequent Purchasers' declaratory-judgment claims. We reverse the trial court's summary judgments granting declaratory relief and the fee and cost awards that were predicated on the grant of declaratory relief and remand those claims to the trial court.

### D. Issue Three—Creekside challenges Broker Blair's right to recover attorney's fees and whether the Escrow Agent's motion for summary judgment raised its claim to recover expert-witness fees.

#### 1. The trial court erred by awarding Carol attorney's fees because she is not an "Other Broker" under Section 17 of the Trust Contract.

As part of its third issue, Creekside challenges whether Carol established her right to recover attorney's fees under a provision of the Trust Contract that she relied

74

on as the basis for that claim.[25]  The provision uses capitalized terms to identify the types of "brokers" who may recover attorney's fees.  Which individual falls within that category of broker is stated in another part of the contract, and Carol is not listed in that provision.  We conclude that the fee provision that she invoked does not entitle her to recover fees.

The trial court granted Carol's summary-judgment motion against Creekside.  The trial court rendered an agreed order embodying Creekside's and Carol's agreement that the trial court would determine her fee claim based on written submissions.  Carol and Hollingsworth then filed a motion seeking their fees.  Carol and Hollingsworth predicated their fee claim on a provision in the Trust Contract that provides in capitalized terms that certain brokers may recover their fees:

> ATTORNEY'S FEES:  A Buyer, Seller, Listing Broker, Other Broker, or escrow agent who prevails in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding.

A later provision of the contract is titled "Broker information and agreement for payment of Brokers' fees."  That provision uses the same capitalized terms as the fee provision and names Hollingsworth but not Carol as the Listing Broker and identifies Creekside's broker as the Other Broker.  We reproduce the provision as it appears in Creekside's brief, which highlights its use of the term "Other Broker":

---

[25]"[T]he American Rule . . . provides that a prevailing party has no inherent right to recover attorney's fees from the non[]prevailing party unless there is specific statutory or contractual authority allowing it." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 487 (Tex. 2019).

**RATIFICATION OF FEE**

Listing Broker has agreed to pay Other Broker _____ of the total Sales Price when Listing Broker's fee is received. Escrow Agent is authorized and directed to pay Other Broker from Listing Broker's fee at closing.

Other Broker: _____ Listing Broker: _____

By: _____ By: _____

**BROKER INFORMATION AND AGREEMENT FOR PAYMENT OF BROKERS' FEES**

| Heritage Creek Real Estate, LLC. | 9008761 | | |
|---|---|---|---|
| Other Broker | License No. | Listing or Principal Broker | License No. |
| Chad Koonce | 710766 | Larry hollingsworth | |
| Associate's Name | License No. | Listing Associate's Name | License No. |
| chadhcre@gmail.com | 325-234-1794 | larry@lrpadmin.com | 940-521-9039 |
| Associate's Email Address | Phone | Listing Associate's Email Address | Phone |
| Jonathan Day | 639241 | | |
| Licensed Supervisor of Associate | License No. | Licensed Supervisor of Listing Associate | License No. |
| 500 Log Cabin Rd | 325-315-3127 | 503 4th St | (940) 521-9039 |
| Other Broker's Office Address | Phone | Listing Broker's Office Address | Phone |
| Mertzon | TX | 76941 | Graham | TX | 76450 |
| City | State | Zip | City | State | Zip |

represents ☑ Buyer only as Buyer's agent
☐ Seller as Listing Broker's subagent

| Selling Associate | License No. |
|---|---|
| Selling Associate's Email Address | Phone |
| Licensed Supervisor of Selling Associate | License No. |
| Selling Associate's Office Address | |
| City | State | Zip |

Listing Broker and "Other Broker" will each receive 2.50% of the sales price at Closing and Funding. Also, the following Broker will be credited with 1.00% of the sales price at Closing and Funding (Carol Blair - license #9001371).

represents ☑ Seller only
☐ Buyer only
☐ Seller and Buyer as an intermediary

Upon closing of the sale by Seller to Buyer of the Property described in the contract to which this fee agreement is attached: (a) ☑ Seller ☐ Buyer will pay Listing/Principal Broker ☐ a cash fee of $_____ or ☑ 2.50 % of the total Sales Price; and (b) ☑ Seller ☐ Buyer will pay Other Broker ☐ a cash fee of $_____ or ☑ 2.50 % of the total Sales Price. Seller/Buyer authorizes and directs Escrow Agent to pay the brokers from the proceeds at closing.

Carol's name is referenced only in the interlined provision at the lower left of the page that we have reproduced.

Creekside responded to the fee motion by challenging the proof offered on the amount of the fees sought but stated that it was not "conceding that any award of fees

76

and costs would be proper."[26]  The trial court granted Carol's fee recovery and awarded her fees and costs in a combined total with Hollingsworth.

At Creekside's request, the trial court signed findings of fact and conclusions of law.  The findings recited the fee provision in the Trust Contract that we have quoted. The trial court then concluded that its "ruling in favor of Hollingsworth/[Carol] on all liability issues as requested in their [t]raditional and [n]o-[e]vidence [m]otion for [s]ummary [j]udgment[] makes them 'prevailing parties[,]' and *therefore [they are] entitled as Brokers to recover their attorneys' fees and costs under the contract for the Small Tract*[ i.e., the Trust Property."]  [Emphasis added.]

Creekside attacks Carol's fee recovery because

> [p]lainly construed, "Other Broker" has a limited meaning in the Howe Trust Property Contract.  The term is capitalized every time it is used, indicating that it describes someone other than a person who happens to be a licensed broker.  The only person identified as "Other Broker" within the contract is Chad Koonce, Creekside's agent.  Carol['s] name is not included in any blank that would have led to her being defined as "Other Broker" and put her on equal footing with Koonce or the Listing Broker for any purpose.  The only place Carol['s] name appears is in a note indicating that Hollingsworth and Koonce (as Listing Broker and Other Broker) would each receive a commission of 2.50% of the sales price at closing and funding, at which time [she] would be "credited" 1.00%.

---

[26]Carol contends that Creekside waived this argument by not raising it in the trial court.  Creekside responds that it is raising a legal-sufficiency challenge and may do so for the first time on appeal because the fee matter was decided in a nonjury case.  *See* Tex. R. App. P. 33.1(d) (stating that "[i]n a civil nonjury case, a complaint regarding the legal or factual insufficiency of the evidence . . . may be made for the first time on appeal in the complaining party's brief").  We will address the argument.

Carol responds that the contract in question is simply a preprinted TREC form and that Creekside attempted to impose duties on her as a Broker. That argument begs the question regarding whether the paragraph that Carol relies on to recover fees entitles her to that recovery. We agree with Creekside that it does not.

Carol claims that the terms of the Trust Contract entitled her to recover fees from Creekside; we review this question de novo. *See Fitzgerald v. Schroeder Ventures II, LLC*, 345 S.W.3d 624, 627 (Tex. App.—San Antonio 2011, no pet.) ("An issue concerning the availability of attorney's fees under a statute or a contract presents a question of law that appellate courts review de novo.").

In *Fitzgerald*, the San Antonio Court of Appeals interpreted an attorney's fee provision in a TREC form contract and provided the basic interpretive tools that we use:

> A court's primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as expressed in the contract. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). Contract terms are given their plain, ordinary, and generally accepted meanings, and contracts are to be construed as a whole in an effort to harmonize and give effect to all provisions of the contract. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

*Id.* at 629–30.

Here, our interpretive task is relatively straightforward. The fee provision capitalizes the words "Other Broker" and then also uses the same capitalized term in another contract provision and specifically identifies a person other than Carol as the "Other Broker." Then, the contract has a provision that describes the commission that brokers will receive, and that again uses the term "Other Broker" but refers to

78

Carol only as a "Broker." Thus, the contract form uses a particular term and capitalizes that term wherever it is used. That drafting choice in the Trust Contract has consequences. *See Prentice v. Frost Bank*, No. 03-15-00506-CV, 2017 WL 2729896, at *7 (Tex. App.—Austin June 23, 2017, pet. denied) (mem. op.) (interpreting the terms "guaranty" and "guarantor" to have a specific meaning because the terms were capitalized). We are bound by the language of the document before us, and we must assign significance to the drafter's decision to capitalize the term "Other Broker" when it is used. We cannot substitute the ordinary meaning of the uncapitalized term "other broker" as Carol advocates in view of the decision to capitalize the term and then use the capitalized term when identifying the Other Broker.

We have no idea whether the failure to list Carol as an "Other Broker" was conscious or, as is more likely, was a drafting decision made without any thought regarding how the nomenclature used to describe Carol might impact her ability to recover fees should a dispute over the contract arise. Deciding that question is beyond our purview. *See Perthuis v. Baylor Miraca Genetics Labs., LLC*, 645 S.W.3d 228, 236 (Tex. 2022) ("Judicial interpretations of contracts are 'governed by what [the parties] said in [their] contract, not by what one side or the other alleges they intended to say but did not.'" (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010) (op. on reh'g))). We hold that Carol is not entitled to recover fees because she is not identified in the Trust Contract as an "Other Broker" and thus does not fall within the terminology of the contract's fee provision.

We sustain the portion of Creekside's third issue attacking Carol's fee recovery, and we render judgment that she is not entitled to recover attorney's fees.

### 2. The trial court erred by granting the Escrow Agent a recovery of its expert-witness fee because it did not raise that claim as a ground in its motion for summary judgment.

In another argument bereft of authority and as part of its third issue, Creekside argues that the trial court erred by granting the Escrow Agent a summary judgment decreeing recovery of its expert-witness fees as costs. Because we conclude that the Escrow Agent's summary-judgment motion did not state a ground for recovery of the fee as a cost, we will reverse and remand this issue to the trial court. We, however, express no opinion on whether the expert-witness fee is a cost as that term is used in the Trust Contract that the Escrow Agent relied on to recover the fee.[27]

In its motion for summary judgment, under a section entitled "Claim for Attorney's Fees," the Escrow Agent sought a recovery under Section 17 of the Trust Contract that we have previously quoted. The motion quoted Section 17 and then sought recovery of attorney's fees and "costs related to this proceeding." No mention was made of expert-witness fees. The trial court's order granting the motion decreed that Creekside was liable to the Escrow Agent for "all of [the Escrow Agent's] costs related to this matter" and then added the phrase "including sums spent on expert witnesses." In essence, Creekside argues that it had no notice that the Escrow Agent

_____

[27]In its reply brief, Creekside withdraws its appellate challenge to the amount of attorney's fees that the trial court awarded the Escrow Agent.

had raised a summary-judgment ground that the contract's provision allowing the recovery of costs permitted the Escrow Agent to recover its expert-witness fees. Based on the unique interrelation between the term "costs" and expert-witness fees, we agree.

A motion for summary judgment must state its grounds, that is, it should give "notice of all matters expected to be asserted in arguing the motion." *Steeltec Constructors, L.L.C. v. Fish & Sky Marine, GP-LCC*, No. 02-21-00285-CV, 2022 WL 1682409, at *4 (Tex. App.—Fort Worth May 26, 2022, no pet.) (mem. op.) (quoting *McConnell*, 858 S.W.2d at 341). If the grounds raised are not absent but are instead unclear, it is the nonmovant's duty to except to the motion. *McConnell*, 858 S.W.2d at 342–43. We conclude that the Escrow Agent's motion did not clearly raise a ground regarding the expert-witness fee.

The question of whether an expert-witness fee is a "cost" has a surprisingly complex backstory that is generated by whether the fee is considered a recoverable court cost. The question regarding whether an expert witness's fee is recoverable as a court cost is the subject of controversy because it is generally considered "merely [an] incidental expense[] in preparation for trial and [is] not recoverable" as a court cost. *Premcor Pipeline Co. v. Wingate*, No. 09-22-00117-CV, 2024 WL 1565334, at *16 (Tex. App.—Beaumont Apr. 11, 2024, no pet.) (mem. op.) (quoting *Whitley v. King*, 581 S.W.2d 541, 543–44 (Tex. App.—Fort Worth 1979, no writ)). But this rule is not without exceptions, such as in particular family-law cases. *See Diaz v. Diaz*, 350 S.W.3d

251, 256 (Tex. App.—San Antonio 2011, pet. denied) (op. on reh'g). And cases acknowledge that the recovery of expert-witness fees as a cost may be provided for by contract. *See Sandberg v. STMicroelectronics, Inc.*, 600 S.W.3d 511, 527 (Tex. App.—Dallas 2020, pet. denied) (quoting *Shenandoah Assocs. v. J & K Props., Inc.*, 741 S.W.2d 470, 486 (Tex. App.—Dallas 1987, writ denied) (op. on reh'g)).

A recent case has held that a provision in a contract allowing for the recovery of "costs" may be broad enough to cover expert-witness fees based on the principle that the term "cost" has a broader import than the term "court costs":

> [A]ppellants urge that expert[-]fee expense is not recoverable under Texas law. *See* [Tex.] Civ. Prac. & Rem. [Code Ann.] § 31.007(b) (in suit for declaratory judgment, trial court has discretion to award a party its costs and reasonable attorney's fees as are equitable and just). [Appellee] responds asserting it sought to recover litigation costs under the lease and was not limited to court costs recoverable under [S]ection 31.007 of the [C]ivil [P]ractice and [R]emedies [C]ode. Awarding costs is largely a matter of trial[-]court discretion. *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 662 (Tex. App.—Dallas 2012, no pet.). We must uphold the trial court's decision unless it is clear the court's decision was arbitrary and unreasonable. *Id.*
>
> Under paragraph 30 of the lease agreement, a prevailing party is entitled to recover prejudgment interest, reasonable attorney's fees, and all other costs of litigation from the nonprevailing party. Litigation costs are not necessarily synonymous with court costs. *Id.* We conclude the trial court did not abuse its discretion by impliedly finding the expert fees were allowed under the contractual provision allowing the prevailing party to recover costs of litigation. *See id.*

*Virtuolotry, LLC v. Westwood Motorcars, LLC*, No. 05-19-01055-CV, 2024 WL 4211328, at *14 (Tex. App.—Dallas Sept. 17, 2024, no pet. h.) (mem. op. on remand).

82

Based on the nebulous relation between costs and expert-witness fees, we agree that the Escrow Agent's motion for summary judgment did not state a ground for recovery of an expert-witness fee as a cost referenced in Section 17 of the Trust Contract. We sustain Creekside's issue only to the extent of remanding this issue to the trial court so that the Escrow Agent may place the issue appropriately before the trial court; we express no opinion on whether the expert-witness fees that the Escrow Agent seeks are "costs" as that term is used in Section 17.

We sustain the portion of Creekside's third issue challenging whether the Escrow Agent's motion for summary judgment adequately raised a ground that the Trust Contract entitled it to recover expert-witness fees.

### E. Issue Four—Creekside challenges the specific fee awards made by the trial court.

Our holdings throughout this opinion and concessions made by Creekside obviate the need for a discussion of the issues raised in Creekside's fourth issue. Accordingly,

- We reverse the Estate's recovery of attorney's fees (including fees on appeal) because the trial court erred by granting the Estate's declaratory-judgment claim, and we remand that claim.

- We reverse the Subsequent Purchasers' recovery of attorney's fees (including fees on appeal) because the trial court erred by granting the Subsequent Purchasers' declaratory-judgment claim, and we remand that claim.

- Because we hold that Broker Blair is not entitled to recover attorney's fees and because such fees were included with Broker Hollingsworth's

83

fee award, we render judgment that she take nothing on her fee claim and remand the award of Broker Hollingsworth's attorney's fees (including fees on appeal). Because we are remanding this claim and because the proof on remand may change, we do not address but remand the issue raised by Creekside in its fourth issue of whether Broker Hollingsworth may recover paralegal fees.

- We remand the issue of whether the Escrow Agent is entitled to recover expert-witness fees but otherwise affirm the trial court's award of attorney's fees to the Escrow Agent based on the concession made by Creekside in its reply brief.

## IV. Conclusion

Having overruled Creekside's first issue challenging the trial court's summary-judgment rulings on Creekside's liability theories with one exception, we remand Creekside's fraud claim against the Estate for a new trial.

Having sustained Creekside's second issue challenging the grant of summary judgment to the Estate and the Subsequent Purchasers on their declaratory-judgment claims, we reverse the trial court's summary judgments granting declaratory relief and the fee and cost awards that were predicated on the grant of declaratory relief and remand those claims to the trial court.

Having sustained Creekside's third issue, (1) we reverse the attorney's fee award to Carol and render judgment that she is not entitled to recover attorney's fees but remand the Brokers' attorney's fees to the trial court for further proceedings because the fee amount was consolidated, and (2) we reverse the Escrow Agent's recovery of expert-witness fees and remand that issue to the trial court for further proceedings consistent with this opinion.

Having resolved Creekside's fourth issue based on our ruling on its prior issues, we remand those issues for further proceedings consistent with this opinion.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  February 20, 2025